973 A.2d 933

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. MANUEL
A. FAJARDO-SANTOS, DEFENDANT-RESPONDENT.

Argued April 28, 2009—Decided July 8, 2009.

*Joseph P. Connor, Jr.,* Deputy First Assistant Prosecutor, argued the cause for appellant (*Robert A. Bianchi,* Morris County Prosecutor, attorney).

*Michael S. Fletcher,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

*Frank Muroski,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Anne Milgram,* Attorney General, attorney).

*Catherine A. Foddai,* Senior Assistant Bergen County Prosecutor, submitted a brief on behalf of *amicus curiae* County Prosecutors Association of New Jersey (*Paula T. Dow,* Essex County Prosecutor, President, attorney; *Ms. Foddai* and *John J. Scaliti,* Senior Assistant Bergen County Prosecutors, of counsel and on the brief).

Chief Justice RABNER delivered the opinion of the Court.

The primary purpose in setting bail is to ensure a defendant's presence at trial. With that in mind, judges consider various

factors before fixing a specific amount of bail. If the circumstances underlying that decision change, an increase or reduction in bail may be appropriate.

In this case, after bail was set for an undocumented immigrant in a criminal case, federal authorities lodged a detainer against him. That set in motion a process that was expected to lead to defendant's removal from the United States before trial. Next, after defendant had already posted a bond, the prosecutor successfully sought an increase in bail by arguing there was an increased risk defendant would not appear at future court proceedings.

On an emergent appeal, the Appellate Division reinstated the initial, lower bail. The panel reasoned that because defendant's immigration status was known at the start of the case, and his possible removal was foreseeable, there was no change in circumstances justifying an increase in bail.

We disagree. Federal authorities exercised their discretion in lodging a detainer against defendant. That increased the risk that he would not appear at trial. The trial judge then properly responded to a change in circumstances by increasing defendant's bail.

In the future, if prosecutors intend to move for higher bail after a detainer is lodged, they should not wait until after a defendant posts bail. Because there was no evidence of bad faith in the timing of the request in this case, we reverse and reinstate the higher bail.

## I.

On or about August 24, 2008, defendant Manuel Fajardo–Santos, a thirty-year-old native of Honduras, spent the night at his girlfriend's home. While there, he allegedly sexually molested his girlfriend's nine-year-old sister. The following day, the local police charged defendant with first-degree aggravated sexual assault and third-degree endangering the welfare of a child. On the

face of the complaint/warrant, bail was set at $75,000, "no 10%,"— that is, defendant was required to secure the full amount in cash, bond or property. The complaint also stated that there was reason to believe defendant was an "illegal immigrant."

Defendant was committed to the Morris County Correctional Facility in lieu of bail on August 26, 2008. At a mandatory bail review hearing the next day, the Hon. John B. Dangler, J.S.C., reviewed and maintained defendant's bail, pursuant to *Rule* 3:26–2(c). Defendant remained in jail afterward.

Pursuant to a directive from the Attorney General, county officials notified U.S. Immigration and Customs Enforcement (ICE) about defendant's arrest and immigration status some time after his arrest.

A grand jury in Morris County returned an indictment on December 9, 2008, charging defendant with first-degree aggravated sexual assault, *N.J.S.A.* 2C:14–2(a)(1), second-degree sexual assault, *N.J.S.A.* 2C:14–2(b), and second-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4(a). Defendant faces a possible sentence of up to twenty years on the first-degree charge, and up to ten years on the second-degree violations. The sexual assault charges are subject to the No Early Release Act, which would require defendant to serve eighty-five percent of his sentence before being eligible for parole. *N.J.S.A.* 2C:43–7.2(d)(7), (8).

On December 18, 2008, nearly four months after defendant's arrest, ICE lodged a detainer against defendant at the Morris County Correctional Facility. The detainer was designed to enable ICE to take custody of defendant if he were released from county jail.

Defendant was arraigned and posted bail on the Morris County charges on January 7, 2009. He used a professional surety to post a $75,000 bond. He was released from state custody on January 12, 2009, and, pursuant to the detainer, was turned over to ICE. ICE, in turn, placed him in federal custody pending removal proceedings.

In response to defendant's transfer to federal custody, a captain at the Prosecutor's Office spoke with an assistant field office director for ICE. According to a certification filed by the captain, the ICE official reviewed defendant's file, advised that he was being held in federal custody on $15,000 bail, and explained that his removal from the United States seemed "likely."

The State moved to increase defendant's bail on January 13, 2009, arguing that the detainer increased the risk of non-appearance. The next day, Judge Dangler agreed and ruled that ICE's lodging of a detainer presented a strong risk that defendant would not be able to appear for subsequent court proceedings. Over defendant's objection, Judge Dangler exonerated the original bail and set bail anew at $300,000, cash only. ICE then honored an order to produce, issued by the trial court, and returned defendant to state custody.

On January 20, 2009, defendant filed an emergent application for leave to appeal. The Appellate Division granted the application and ruled in defendant's favor one week later. The panel reasoned:

> The Prosecutor was aware that Morris County would notify ICE of defendant's custody status pursuant to standard Attorney General procedure, ICE would have lodged a detainer against defendant's release, and would have picked him up as soon as he made bail in Morris County. The fact that this actually happened is not a new factor justifying a fourfold increase of bail.... We do not consider the happening of what could reasonably be predicted as any change of circumstances.

The panel therefore summarily reversed and reinstated the initial $75,000 bail. It also ordered defendant to be returned to ICE's custody, where he would have the "opportunity to post bond and then participate in the defense of both proceedings."

The Appellate Division's order was stayed, first by the Appellate Division and then by this Court. On February 24, 2009, we granted the State's motion for leave to appeal.

## II.

The State argues that the lodging of a detainer is a changed circumstance that justifies an increase in bail; that ICE's decision

to lodge the detainer was an exercise of discretion and not a ministerial act, and therefore was not a foregone conclusion; and that removal is a relevant risk factor in assessing whether a defendant will appear for trial, and therefore is appropriate to consider under *Rule* 3:26–1(a) even after bail is set. The State also maintains that changed circumstances are not needed for judges to revisit bail because they retain the discretionary authority to modify bail decisions until the entry of a final judgment.

Defendant agrees with the Appellate Division that the lodging of a detainer in this case is not a changed circumstance justifying an increase in bail. He contends the State was aware of his illegal status and could have sought higher bail initially, at the mandatory bail review, or right after the detainer was lodged. He claims the State had no problem with the amount of bail until he posted it. He also argues that when the trial judge initially set bail, he mistakenly believed a detainer had already been lodged. In a supplemental filing, defendant argues that under existing federal regulations the State can effectively halt removal proceedings by not consenting to them, which further undermines any need for an increase in bail.

We granted amicus curiae status to the Attorney General of New Jersey and the County Prosecutor's Association, and both urge that the judgment of the Appellate Division be reversed. The Attorney General argues that the panel wrongly presumed a detainer would be lodged in this case, noting that only fifteen percent of cases recently referred by law enforcement in New Jersey resulted in the lodging of a detainer. After one was lodged here, amici assert that the panel ignored the additional incentive defendant had to flee or agree to removal. Amici ask that they be allowed to return to court and seek an increase in bail when removal becomes likely. Otherwise, they claim that courts will be tacitly encouraged to set bail as high as possible initially for many who will not be subject to removal. The Attorney General also contends that courts must be free to reconsider bail at any appropriate time, without proof of a change in circumstances.

### III.

A brief review of the removal process is useful for the discussion that follows. ICE is responsible for enforcing the federal immigration laws. When New Jersey law enforcement officials arrest someone for an indictable offense and have reason to believe the person is an undocumented immigrant, they must notify ICE. N.J. Attorney General, Directive # 2007–3 (Aug. 22, 2007), *available at* http://www.nj.gov/lps/dcj/agguide/ directives/dir–le_dir–2007–3 .pdf. ICE then determines on its own if the arrestee is subject to removal from the United States. *See* 8 *C.F.R.* § 287.7(c). If ICE reaches that conclusion and decides to begin removal proceedings, it may issue a detainer to the agency holding the alien/defendant. 8 *C.F.R.* § 287.7(a). The detainer "serves to advise" the agency that ICE seeks custody of the defendant "for the purpose of arresting and removing" him or her. *Ibid.* For that reason, the detainer also asks the agency to notify ICE before releasing the defendant. *Ibid.*

Once a detainer is lodged, if the defendant posts bail on state charges, the federal government takes custody of him or her "without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense." 8 *U.S.C.A.* § 1226(c)(1).

Ultimately, an immigration judge conducts proceedings and decides whether the alien is removable. 8 *U.S.C.A.* § 1229a(a)(1), (c)(1)(A). The burden of proof is on the alien to show that he or she is lawfully present in the United States. 8 *U.S.C.A.* § 1229a(c)(2)(B). Alternatively, the alien may stipulate to removal. 8 *U.S.C.A.* § 1229a(d).

If the immigration judge enters an order of removal, the Attorney General "shall remove" the alien promptly. *See* 8 *U.S.C.A.* § 1231(a)(1)(A), (B) (requiring removal within ninety days of certain statutory triggers). "Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal." 8 *U.S.C.A.* § 1231(a)(4)(A). In other

words, the possibility of a future conviction on pending state charges is not a reason to delay removal.

In a supplemental filing, defendant submits that 8 *C.F.R.* §§ 215.2 and .3 provide a mechanism for state prosecutors to delay removal of defendants with pending criminal charges. However, those regulations appear to relate only to aliens who voluntarily depart the United States—as in the case of temporary foreign workers, for example, *see* 8 *C.F.R.* § 215.9–and not illegal aliens who are ordered removed.

Section 215.2 authorizes departure-control officers to prevent an alien's "departure" if it "would be prejudicial to the interests of the United States under the provisions of § 215.3." That section identifies eleven categories of aliens who meet the above standard, including aliens in possession of U.S. national security plans, aliens "seek[ing] to depart" the United States to obstruct U.S. national defense measures, aliens "seek[ing] to depart" to organize or participate in a rebellion against the United States or an ally, and aliens whose technical or scientific training might be used by an enemy. 8 *C.F.R.* § 215.3(a), (b), (d), (i).

■ Defendant highlights an additional category of aliens whose departure may be prevented:

> Any alien who is needed in the United States as a witness in, or as a party to, any criminal case under investigation or pending in a court in the United States: Provided, That any [such] alien ... may be permitted to depart from the United States with the consent of the appropriate prosecuting authority....
>
> [8 *C.F.R.* § 215.3(g).]

Defendant contends that that provision enables prosecutors to delay his removal. In so arguing, he misreads the import of the regulation.

Several things point to the regulation's apparent focus on aliens seeking to depart the United States voluntarily, and not deportation or removal cases. First, the legislative authority for 8 *C.F.R.* § 215 is contained in 8 *U.S.C.A.* § 1185(a). That statute, entitled "Travel control of citizens and aliens," provides for regulations to allow aliens to "depart" or "enter" the United States. *Compare* 8

*U.S.C.A.* § 1185(a), *with* 8 *U.S.C.A.* § 1231 (addressing involuntary "removal" of alien by the Attorney General). Second, the regulations expressly focus on the voluntary nature of a departure by providing that an alien may be prevented from leaving "where doubt exists whether such alien is departing or seeking to depart from the United States voluntarily." 8 *C.F.R.* § 215.3(j); *see Polovchak v. Meese,* 774 *F.*2d 731, 733–34 (7th Cir.1985) (evaluating temporary departure-control order preventing return of minor to Soviet Union with his parents where minor was seeking asylum over objections of his family). In the same clause, the regulations note that court-ordered departures are to be carried out. *Ibid.* (preventing involuntary departures *"except* [for] an alien who is departing or seeking to depart subject to an order issued in extradition, exclusion, or deportation proceedings" (emphasis added)).

A third part of the regulations reinforces the conclusion that they govern aliens who are free to depart. The regulations direct departure-control officers to serve aliens who fall within the eleven defined categories with "a written temporary order directing [them] not to depart." 8 *C.F.R.* § 215.2(a). An alien may then request a hearing before an immigration judge to contest the order. *See* 8 *C.F.R.* §§ 215.2(b), .4, .5. That procedure is separate from—and can be inconsistent with—the removal process outlined above. It would make little sense, for example, to permit an alien who unsuccessfully challenged removal proceedings in a case like the pending one to later contest an order directing that he remain in the United States.

██ Regulations may not trump the statutes that authorize them. *Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 *U.S.* 837, 844–45, 104 *S.Ct.* 2778, 2782–83, 81 *L.Ed.*2d 694, 703–04 (1984); *see also Reilly v. AAA Mid–Atlantic Ins. Co. of N.J.,* 194 *N.J.* 474, 486, 946 *A.*2d 564 (2008) (noting that when "regulation is 'plainly at odds with the statute, we must set it aside.'" (citation omitted)).

Defendant's reading of sections 215.2 and .3 conflicts with the statutory obligation imposed on the executive branch in removal

cases—"the Attorney General shall remove the alien from the United States within a period of 90 days," 8 *U.S.C.A.* § 1231(a)(1)(A)—and the statute's plain instruction that the "possibility of ... further imprisonment is not a reason to defer removal," 8 *U.S.C.A.* § 1231(a)(4)(A).

No conflict is present, though, when the regulations are applied to aliens who are free to depart the United States rather than illegal aliens being removed by ICE. Prosecutors may use the regulations to try to prevent the former group from departing, but not the latter. As a result, Morris County officials could not block defendant's removal under sections 215.2 or .3.

## IV.

Article I, paragraph 11 of the State Constitution guarantees that "[a]ll persons shall, before conviction, be bailable by sufficient sureties." In setting the proper amount of bail, courts seek to ensure the presence of the accused at trial. *State v. Johnson,* 61 *N.J.* 351, 364, 294 *A.2d* 245 (1972); *R.* 3:26–1(a). Just as a defendant has a right to a reasonable bail, the public and victims of crime in particular have an interest in a fair and meaningful trial, with the defendant present in the courtroom.

In deciding the appropriate amount of bail in a particular case, courts consider the following factors:

(1) the seriousness of the crime charged against defendant, the apparent likelihood of conviction, and the extent of the punishment prescribed by the Legislature;

(2) defendant's criminal record, if any, and previous record on bail, if any;

(3) defendant's reputation, and mental condition;

(4) the length of defendant's residence in the community;

(5) defendant's family ties and relationships;

(6) defendant's employment status, record of employment, and financial condition;

(7) the identity of responsible members of the community who would vouch for defendant's reliability; [and]

(8) *any other factors* indicating defendant's mode of life, or ties to the community or *bearing on the risk of failure to appear,* and, particularly, the general policy against unnecessary sureties and detention.

[*R.* 3:26–1(a) (emphasis added).]

As the list makes clear, judges engage in a fact-sensitive analysis in setting bail. If those facts change, in light of relevant new evidence or changed circumstances, judges may entertain requests to modify bail. *See, e.g., State v. Wallace,* 146 *N.J.* 576, 580, 684 *A.*2d 1355 (1996) (noting modification of bail when defendant began inpatient psychiatric treatment); *State v. Ceylan,* 352 *N.J.Super.* 139, 144–45, 799 *A.*2d 685 (App.Div.2002) (noting risk of flight changed materially after trial conviction and warranted exoneration of bail). Judges are free to reconsider their initial decision "at any time that it becomes appropriate." *State v. Hawkins,* 382 *N.J.Super.* 458, 466, 889 *A.*2d 1081 (App.Div.2006). The amount of bail can then be increased, reduced, or left alone, consistent with the overriding aim of ensuring a defendant's presence at trial.

When bail is set, it is entirely appropriate to consider a defendant's immigration status in evaluating the risk of flight or non-appearance. *See, e.g., United States v. Miguel–Pascual,* 608 *F.Supp.*2d 83, 83 (D.D.C.2009); *United States v. Chavez–Rivas,* 536 *F.Supp.*2d 962, 969 (E.D.Wis.2008). Defendant does not suggest otherwise. Rather, he challenges the trial court's decision to tie an increase in bail to the lodging of a detainer under the facts of this case.

The filing of a detainer signifies ICE's commitment to remove an alien. The event occurs only after ICE evaluates and determines that a defendant is subject to removal. 8 *C.F.R.* § 287.7(c). The detainer itself announces ICE's decision to obtain custody of the defendant in order to arrest and remove him, 8 *C.F.R.* § 287.7(a), and it sets in motion the entire removal process. As a result, a detainer places the custodial agency *and* the defendant on notice that what was once a theoretical possibility of deportation has become a concerted effort by the federal government to achieve that outcome.

Some defendants facing a greater prospect of removal will have an additional incentive not to appear for trial. They might affirmatively use the detainer process to avoid prosecution and

possible punishment by posting bail in the State's case with the expectation that the federal government will return them to their native country. On the other hand, certain defendants might be more determined to clear their name and vigorously contest removal to remain with family members in the United States. In either event, the lodging of a detainer marks a change in circumstances that can affect whether a defendant will fail to appear. Judges may therefore consider that development in deciding whether to modify bail.

The Appellate Division, responding to an emergent appeal without full briefing, mistakenly assumed that the lodging of a detainer is readily predictable whenever county officials make a referral to ICE. That is not the case. ICE's decision to lodge a detainer is discretionary, and is not subject to judicial review. 8 *U.S.C.A.* § 1226(e). According to the Attorney General, ICE's New Jersey field office issued detainers in less than fifteen percent of the total cases referred by New Jersey law enforcement from October 2007 through September 2008. *See also* Kareem Fahim, *Immigration Referrals by Police Draw Scrutiny, N.Y. Times,* Mar. 23, 2008, at A1. ICE's exercise of discretion lends further support to treating a detainer as a new consideration in the bail analysis.

 There is also a danger in assuming that detainers will always be lodged. That view could impose pressures to seek and set higher bails in all cases involving suspected undocumented immigrants, including the majority of cases in which no detainer is ever lodged. Such an outcome would run contrary to settled law, because "the constitutional right to bail should not be unduly burdened." *Johnson, supra,* 61 *N.J.* at 364, 294 *A.2d* 245. Nor may excessive bail be required. *N.J. Const.* art. I, ¶ 12; *see also Report of the Supreme Court Committee on Criminal Practice, Subcommittee on Bail,* 125 *N.J. L.J.* 109, 113 (1990) (noting the importance of treating fairly defendants with limited resources). The better course is to permit prosecutors to return to court after ICE issues a detainer and thereby demonstrates its resolve to remove a defendant.

■ Prosecutors, however, must make timely applications to increase bail once a detainer is lodged. The State represents that it intends to seek higher bails only in more serious cases. In those instances, as a general rule, the State should not wait until a defendant has posted bail before filing a motion to modify and increase bail. Otherwise, defendants may suffer a monetary loss that can and should be avoided.

Defendants routinely post surety bonds to meet their bail obligation. To do so, they or others on their behalf first enter into a private contract with a commercial bail agent. Sureties typically require a non-refundable fee of ten percent before they will post a bond with the court. *See* U.S. Dep't of Justice, *Pretrial Release of Felony Defendants in State Courts* 3 (2007); N.J. Judiciary, *Frequently Asked Questions About Superior Court Bail* (2007), *available at* www.judiciary.state.nj.us/prose/11199_bail_faq_superior.pdf. If bail is increased after that payment is made, defendants and their families risk losing the fee without the benefit of having been released.

There may be exceptional circumstances in which ICE lodges a detainer, the defendant posts bail, and prosecutors then seek an increase in bail. In those situations, prosecutors should provide reasons for the delay.[1] In addressing the motion, then, trial courts will be in a position to weigh all of the equities by considering, among other things, the length of delay, reasons proffered, and likelihood defendant will suffer a financial loss, as well as the heightened risk of non-appearance, seriousness of the offense, likelihood of conviction, potential punishment, and other relevant factors under *Rule* 3:26–1(a).

## V.

Applying those principles, we see no reason to disturb the trial court's judgment. The court responded reasonably to the detain-

---

[1] It is a different matter entirely if a defendant posts bail before a detainer is lodged. Prosecutors may seek to modify bail afterward without having to explain the timing of the application.

er lodged and the increased risk of non-appearance it presented. *See Johnson, supra*, 61 *N.J.* at 364, 294 *A.*2d 245 (noting that bail decision "is a matter for the discretion of the trial courts" to "be exercised reasonably"); *see also State v. Ventura*, 196 *N.J.* 203, 206, 952 *A.*2d 1049 (2008) (using abuse of discretion standard to review fact-sensitive decision whether to remit forfeited bail).[2]

 We also find no evidence of bad faith in the manner the case was handled by the prosecutor's office, which moved to increase bail one day after it was posted when the office learned from ICE that defendant's removal seemed "likely." At the time, the Prosecutor was unaware that the federal government could remove a defendant with pending state charges. Having learned from that experience, the office put a system in place to avoid a recurrence of what happened here. The office, working with the jail, now regularly checks to see if any ICE detainers have been lodged against defendants, so that motions to modify bail may be promptly filed. We commend that practice to other prosecutors' offices so that in the future, armed with this opinion, they can be expected to file timely motions to modify bail once ICE lodges a detainer.

Finally, although the facts in this case qualified as changed circumstances, by using that terminology we do not suggest that a judge could not otherwise correct an error or reconsider bail if there are reasons to do so. *See R.* 3:26–2(c) (noting that municipal court judges have authority to make bail revisions on non-indictable offenses at any time).

---

2 Defendant argues that Judge Dangler mistakenly believed that a detainer had been lodged when he reviewed the bail. Defendant relies on the following comment for support: "Bail will be maintained, $75,000, no ten percent. The same bail conditions when bail was first set remaining, also *subject to an immigration detainer.*" (emphasis added). The remark was ambiguous at best, as defendant conceded at oral argument. The last phrase can be read as defendant urges. It can also mean that the trial judge left open the possibility of altering bail if a detainer were lodged in the future. Because the same judge granted the motion to increase bail, after learning that a detainer had recently been filed, it is apparent that he did not factor that into his earlier decision.

## VI.

For the reasons set forth above, we reverse the judgment of the Appellate Division and reinstate bail at $300,000.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.