# IN THE SUPREME COURT OF IOWA

No. 18–0955

Filed October 18, 2019

**STATE OF IOWA,**

Appellee,

vs.

**GUILLERMO AVALOS VALDEZ,**

Appellant.

---

Appeal from the Iowa District Court for Woodbury County, John D. Ackerman, Judge.

The defendant appeals his sentence of incarceration, arguing the district court erred in declining to order probation. **AFFIRMED.**

Scott M. Wadding of Sease & Wadding, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Kyle Hanson, Assistant Attorney General, Patrick Jennings, County Attorney, and Kristine Timmins, Assistant County Attorney, for appellee.

**MANSFIELD, Justice.**

This case presents the question whether immigration status may be considered during sentencing. The defendant in this case is a Mexican national who pled guilty to and was convicted of a class "C" felony drug offense. He was placed on an immigration hold for likely deportation. At sentencing, the defendant sought probation, while the State requested incarceration. The district court imposed a prison sentence, expressing the view that it would not be feasible to order probation for someone who was going to be deported to Mexico. The defendant appeals.

On appeal, we conclude, like the majority of other jurisdictions, that immigration status per se is not an appropriate sentencing consideration, but that immigration status may be taken into account to the extent it affects an otherwise relevant sentencing factor. We also conclude that on this record, the district court properly determined that probation would not be appropriate for someone whose probation would have to be supervised in Mexico. We therefore affirm the defendant's conviction and sentence.

## I. Facts and Procedural History.

Guillermo Avalos Valdez was born in Mexico in 1981. In 1997, he entered the United States without legal permission. He settled in Merced, California.

On December 24, 2017, Avalos Valdez was stopped on Interstate 29 in Woodbury County for driving eighty-four miles per hour in a seventy miles-per-hour zone. As two Woodbury County deputies approached the vehicle, they could smell marijuana coming from it. They removed Avalos Valdez and a female passenger from the vehicle. A subsequent search uncovered two hockey-sized duffle bags and two boxes with Christmas-themed wrapping paper containing a total of 184 pounds of marijuana,

mostly divided into individually heat-sealed one-pound bags. A .45 caliber pistol with a loaded magazine and Grim Reaper handgrips was found under the front passenger seat. Avalos Valdez had a tattoo showing a Grim Reaper with a marijuana leaf, and the female passenger also had a Grim Reaper tattoo. The vehicle was registered to an "Iran Guillermo Avalos Valdez."

Avalos Valdez was charged with possession with intent to deliver a controlled substance, more than fifty but not more than 100 kilograms of marijuana, a class "C" felony. *See* Iowa Code § 124.401(1)(*c*)(5) (2017). He was also charged with a drug stamp tax violation, a class "D" felony. *See id.* § 453B.12(2). Avalos Valdez waived speedy trial.

On May 18, 2018, Avalos Valdez entered into a written agreement with the State to plead guilty to the possession with intent to deliver count, with the drug stamp tax violation being dismissed and the parties being free to argue sentence.

A presentence investigation (PSI) report had been prepared. The report noted a prior California conviction in 2008 for vandalism. Avalos Valdez indicated that he had done general labor (although he had some back issues) and made approximately $12,000 in 2017. Avalos Valdez told the interviewer that he was a regular marijuana user for his back issues and described "being on an adventure" when he was arrested. At the time of sentencing, Avalos Valdez was on a United States Immigration and Customs Enforcement (ICE) hold for potential deportation. The PSI report stated that on the Iowa Risk Revised (IRR) risk assessment tool, Avalos Valdez "scored in the low category for future violence and the low category for future victimization." According to the PSI report, "The IRR would further indicate the Defendant would be supervised initially at the low normal level of supervision should he be

supervised in the community." However, the report also noted the quantity of marijuana involved and recommended that Avalos Valdez receive a term of incarceration.

On May 22, the district court held a hearing for the purpose of plea taking and sentencing. During the guilty plea colloquy, defense counsel addressed the immigration consequences of Avalos Valdez's plea and explained, "[B]ecause this is an aggravated felony and a controlled substances offense, there would be deportation, mandatory detention, if he does have any removal proceedings." The court accepted Avalos Valdez's guilty plea and, with the consent of the parties, proceeded to sentencing. The State asked for imprisonment:

> Your Honor, the State would be requesting that the defendant be sentenced to an indeterminate term of incarceration of ten years, that the minimum fine of $1,000 plus the 35 percent surcharge be imposed and that that be suspended, and the other mandatory minimum requirements.
>
> The State believes that that penalty is appropriate due to the fact that the defendant did have 180 pounds of marijuana in his possession at that time, which is a significant amount. The defendant also has no significant ties to the area as well as the immigration hold which will make it difficult for him to complete probation. The State believes that the presentence investigation recommendation of the prison sentence is the appropriate one in this case, and that's what we would request.

Defense counsel responded by asking for probation:

> My client is asking that the Court grant him probation on this offense. The presentence report indicates that the Iowa risk revised assessment that was used indicates he has a -- he has a low category for future violence, a low category for future victimization, and that the IRR would indicate he could be supervised initially on a low/normal level in the community.
>
> I realize he has an immigration hold, but he, essentially, only has one prior conviction for vandalism back in 2008; so he really doesn't have a criminal history to speak of at all.

With probation, I realize he's going to be taken into custody by immigration. He has the hold. It's likely he will be deported. I know there are times, at least in federal court, where we have made a term of probation "You shall not illegally re-enter the United States" so that if he ever comes back to the United States he will be in violation of his probation and he would be brought back to court.

He's requesting that he be given that opportunity to deal with his immigration and let them make that determination. Otherwise, other than the quantity involved here, if he was here as a United States citizen, I think that probation would be something that would definitely be a possibility. So we are asking that he be treated the same as someone else would and let immigration handle the immigration consequences that he is aware of.

The court imposed a prison sentence as requested by the State. It stated,

I want to address some of your comments. The statement that you think this Court would give a U.S. citizen with the same record a suspended sentence is not accurate. 180 pounds of marijuana is one big deal, and it's -- he's a danger to the community. And he's also a flight risk. I don't think probation would be appropriate with pleading to this charge given his immigration status. He won't be available if I were to award probation, as I understand it. So I don't think probation is an appropriate sentence here.

Therefore, the Court finds that the sentence imposed will provide for the maximum opportunity for the defendant's rehabilitation, to protect the community from further offenses by this defendant and others. I've considered the nature of the offense committed and the contents of the presentence investigation report and the plea agreement.

Avalos Valdez filed a notice of appeal on May 31. We retained the appeal.

## II. Standard of Review.

We review sentences for abuse of discretion. *State v. Roby*, 897 N.W.2d 127, 137–38 (Iowa 2017). However, our review is not forgiving of a denial of a constitutional right. *Id.* To put it another way, if we disagree with the trial court's fact-finding after applying a de novo standard of

review, we will rely on the facts as we find them to determine whether the Iowa Constitution has been violated. *Id.* at 138.

### III. Mootness.

We must first deal with a threshold question of mootness. On September 17, 2019, the State moved to dismiss Avalos Valdez's appeal as moot. Avalos Valdez was paroled on May 16 of this year, having served approximately seventeen months of his ten-year sentence. He was released to ICE and then taken into the custody of the United States Marshal pending federal prosecution in San Diego, California. The State maintains that these events render Avalos Valdez's appeal moot:

> [E]ven if he prevails on appeal and even if he is resentenced to a suspended sentence, he will face the same result— mandatory immigration detention and impending deportation following his federal criminal charge. This Court cannot grant any relief that will undo the prison time that the defendant has already served. Therefore, a remand for resentencing will have no appreciable effect on the defendant's status.

Avalos Valdez resists the State's motion. He contends the appeal is not moot, and even if it is, an exception to the mootness doctrine applies.

"The key in assessing whether an appeal is moot is determining whether the opinion would be of force or effect in the underlying controversy." *Puntenney v. Iowa Utils. Bd.*, 928 N.W.2d 829, 840 (Iowa 2019) (quoting *Perkins v. Bd. of Supervisors*, 636 N.W.2d 58, 64 (Iowa 2001)), *petition for cert. pending*, No. 19–447 (U.S. Sept. 30, 2019). Avalos Valdez concedes that prevailing on this appeal would not get him released from federal custody. However, he points out there would be a difference going forward if he were deemed on state-ordered probation rather than state-ordered parole. Avalos Valdez contrasts his case with others where the defendant had completely served his sentence. *See, e.g., State v. Wilson*, 234 N.W.2d 140, 141 (Iowa 1975). We also note that if

Avalos Valdez is convicted on the pending federal charge, his federal sentence could be affected by whether he received a suspended sentence or (as actually happened) a ten-year sentence on his state drug trafficking charge. *See* U.S. Sentencing Guidelines Manual § 4A1.1, at 379–82 (U.S. Sentencing Comm'n 2018) (adding 3 points to the criminal history guideline calculation for each prior sentence of imprisonment exceeding one year and one month but only 1 point for a totally suspended sentence).

In any event, we agree with Avalos Valdez that the public-importance exception applies here and warrants our exercise of jurisdiction. We discussed the public-importance exception at some length in *Homan v. Branstad*, 864 N.W.2d 321, 330–31 (Iowa 2015). There we said,

> We consider four factors in determining whether we should exercise our discretion to decide a moot action under this exception:
>
> > (1) the private or public nature of the issue; (2) the desirability of an authoritative adjudication to guide public officials in their future conduct; (3) the likelihood of the recurrence of the issue; and (4) the likelihood the issue will recur yet evade appellate review.

*Id.* at 330 (quoting *Maghee v. State*, 773 N.W.2d 228, 234 (Iowa 2009)).

Weighing those factors here, we find the issue both important and likely to recur. Approximately 50,000 unauthorized immigrants reside in Iowa, comprising 1.7% of the state's population. *U.S. Unauthorized Immigrant Population Estimates by State, 2016*, Pew Research Center (Feb. 5, 2019), www.pewhispanic.org/interactives/u-s-unauthorized-immigrants-by-state/ (follow "DATA" hyperlink). We have already recognized the importance of giving accurate advice to defendants on the immigration consequences of guilty pleas. *See generally Diaz v. State*, 896 N.W.2d 723, 725 (Iowa 2017). Judges, prosecutors, defense counsel, and

defendants also need to know whether immigration status can be considered in sentencing.

Additionally, this issue has the potential to evade appellate review. Whether to order probation for an offender who is subject to deportation is more likely to arise when the offender, like Avalos Valdez, otherwise faces indeterminate prison sentencing totaling ten years or less. In those circumstances, as with Avalos Valdez, it is quite possible that the defendant—even if sentenced to prison—will be paroled to an ICE detainer before any sentencing appeal can be decided. Accordingly, we deny the motion to dismiss and will proceed to the merits of this case.

## IV. Merits.

Avalos Valdez raises a single issue on appeal—whether his sentence violates the Due Process and Equal Protection Clauses of the Iowa and United States Constitutions because it was based on his immigration status. *See* U.S. Const. amend. XIV; Iowa Const. art. I, §§ 6, 9. Our court has not previously addressed the extent to which a sentencing court may take into account a defendant's immigration status.

Avalos Valdez and the State cite and discuss the same out-of-state cases in their briefs, so it behooves us to examine them closely.

In *State v. Zavala-Ramos*, the trial court sentenced a drug offender who had previously been deported and who was on an immigration hold to prison, even though the sentencing guidelines called for a presumptive probationary sentence. 840 P.2d 1314, 1315 (Or. Ct. App. 1992). The defendant appealed the sentence, arguing it was improper for the sentencing court to rely on "his immigration status and immigration law violations." *Id.* The Oregon Court of Appeals took a middle path, reasoning,

Immigration status *per se* is not relevant. However, circumstances that demonstrate a defendant's unwillingness to conform his conduct to legal requirements, whether or not there are criminal consequences, may be. Defendant had been illegally in the United States at least twice. The court could consider that pattern of conduct in determining whether it is likely that a probationary sentence would serve the purposes of the guidelines to protect the public and punish the offender.

*Id.* at 1316 (footnote omitted) (citation omitted). The court nonetheless reversed and remanded for resentencing because the court had not provided a sufficient explanation of "why the circumstances are so exceptional that imposition of the presumptive sentence would not accomplish the purposes of the guidelines." *Id.* at 1317 (quoting *State v. Wilson*, 826 P.2d 1010, 1012 (Or. Ct. App. 1992)).

In *People v. Cisneros*, the California Court of Appeal took a similar middle path. 100 Cal. Rptr. 2d 784, 785 (Ct. App. 2000). It stated,

We conclude that the trial court erred in ruling that illegal aliens are categorically excluded from participation in the deferred judgment program for first-time drug offenders. Trial courts are free to consider illegal alien status as a factor in determining whether a defendant is a good candidate for the deferred judgment program, but illegal alien status is not an automatic disqualification.

*Id.* The court went on,

An illegal alien may be a poor candidate for probation given typically limited ties to the community and the prospect of deportation. The same considerations may weigh against admitting an illegal alien to the deferred entry of judgment program. However, a defendant's misdemeanor violations of the immigration laws in entering the United States without inspection and failing to register do not necessarily constitute "criminal conduct rendering him or her unsuitable for deferred entry of judgment . . . " in every instance.

*Id.* at 788 (citation omitted) (quoting Cal. Penal Code § 1000.3).

The District of Columbia Court of Appeals followed the same center course in *Yemson v. United States*, 764 A.2d 816, 819–20 (D.C. 2001). There the court concluded,

> Because even an illegal alien has a right to due process, a court imposing sentence in a criminal case may not treat the defendant more harshly than any other defendant "solely because of [his] nationality or alien status. That obviously would be unconstitutional." This does not mean, however, that a sentencing court, in deciding what sentence to impose, must close its eyes to the defendant's status as an illegal alien and his history of violating the law, including any law related to immigration. Indeed, "[t]he sentencing court . . . must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed."

*Id.* at 819 (alterations in originals) (first quoting *United States v. Gomez*, 797 F.2d 417, 419 (7th Cir. 1986); then quoting *Wasman v. United States*, 468 U.S. 559, 563, 104 S. Ct. 3217, 3220 (1984)).

Likewise the Nevada Supreme Court. In *Ruvalcaba v. State*, it confronted the following situation:

> We note that the sentencing judge below did not sentence Ruvalcaba more harshly based upon ethnicity or nationality, or because Ruvalcaba committed the crime in a country foreign to him. Nor did the sentencing judge predicate his decision on any animus towards illegal aliens. Rather, the sentencing judge denied Ruvalcaba's request for probation because, as an illegal alien, Ruvalcaba would likely be deported if he received probation and would thus ultimately avoid punishment.

143 P.3d 468, 470 (Nev. 2006). Drawing a distinction between a sentence based on "citizenship" and one based on "the ability to enforce the criminal laws of [the] state," the court affirmed the defendant's sentence. *Id.* at 471. The court observed that "a defendant's ability to comply with the terms of probation is certainly a legitimate factor for a sentencing judge to consider in determining whether to grant probation." *Id.*

In *People v. Hernandez-Clavel*, the Colorado Court of Appeals framed the issue as "whether the circumstances relating to defendant's status as an illegal alien subject to deportation were proper considerations in the sentencing court's decision to grant or deny probation." 186 P.3d 96, 97 (Colo. App. 2008). The court answered yes. *Id.* at 100. It recognized as legitimate the trial court's concern that the defendant's likely deportation meant that he could not benefit from probation or be available to participate in probation. *Id.* The court affirmed the trial court's denial of probation, rejecting also the defendant's contention that his sentence violated equal protection principles. *Id.*

In *Trujillo v. State*, the Georgia Court of Appeals upheld a trial court's decision to deny probation to an unauthorized alien, noting that "the trial court would have been remiss had it ignored the practical realities presented by Trujillo's immigration status and the obstacles that it would have presented to Trujillo's ability to comply with the imposed conditions of probation." 698 S.E.2d 350, 355 (Ga. Ct. App. 2010). The court specifically rejected the defendant's argument that the sentence violated his constitutional rights to due process and equal protection under the law. *Id.* at 353–54.

In *People v. Cesar*, on the other hand, the New York Appellate Division vacated a sentence because the trial court had denied probation "solely on the basis of the defendant's status as an undocumented immigrant." 14 N.Y.S.3d 100, 107 (App. Div. 2015). The court reasoned that this would be a violation of due process and equal protection. *Id.* at 106. Yet the court acknowledged,

> [C]ourts may appropriately consider a defendant's undocumented immigration status in imposing criminal sentences. The decision to impose or not impose a sentence of probation may legitimately be affected by factors directly

related to undocumented status. Those factors include, but are not necessarily limited to, the likelihood of the defendant's deportation during the probationary period, the defendant's history, if any, of repeated departures from and illegal reentries into the United States, the presence or absence of family in the United States, the defendant's employment history, and the defendant's legal employability.

*Id.*

Most recently, in *State v. Cerritos-Valdez*, the Nebraska Supreme Court wrote a thorough opinion that dissected many of these prior cases. 889 N.W.2d 605, 611–13 (Neb. 2017). In that case, the defendant pled guilty to possession of a controlled substance and driving under the influence. *Id.* at 608. The district court denied the defendant's request for probation, commenting, "[I]t's very difficult, if not impossible, for the Court to impose probation when the first term of probation is that you obey all laws; and to obey all laws, you would have to leave this country, which would then conversely make it impossible for you to be supervised by probation." *Id.* at 609.

On appeal, the Nebraska Supreme Court affirmed. *Id.* at 613. Following its survey of prior caselaw from other jurisdictions, the court concluded,

> Based on the foregoing, we agree that a defendant's status as an undocumented immigrant cannot be the sole factor on which a court relies when determining whether to grant or deny probation; however, a sentencing court need not ignore a defendant's undocumented status. When deciding whether to grant probation, a defendant's undocumented status may properly be considered by a sentencing court as one of many factors so long as it is either relevant to the offense for which sentence is being imposed, relevant to consideration of any of the required sentencing factors under Nebraska law, or relevant to the defendant's ability or willingness to comply with recommended probation conditions.

*Id.* at 611–12 (footnotes omitted). The court then found the defendant's sentence in compliance with these parameters:

> Here, the district court expressed concern that due to Cerritos-Valdez' undocumented status, it would be difficult for him to comply with the standard terms of probation. Generally speaking, this is an appropriate sentencing consideration; it was a concern shared by the probation officer who completed the PSI, and it was one which was supported by the information contained in the PSI.

*Id.* at 612–13.

Sifting through these authorities, they appear to point in a single direction. A defendant's immigration status, qua immigration status, may not be the basis for a sentence. However, to the extent immigration status affects an otherwise relevant sentencing factor, it may be taken into account.

Avalos Valdez cites one case to the contrary—*State v. Mendoza*, 638 N.W.2d 480 (Minn. Ct. App. 2002). In that case, the probation officer indicated in the PSI that she had been told the defendants, both Mexican nationals, would be deported once released. *Id.* at 482. The district court declined to order probation for them because their immigration status made probation "impossible and impractical." *Id.* The court reversed the sentence. Without citing or discussing any out-of-state authority, it noted that deportation is a "collateral" consequence of a guilty plea. *Id.* at 483. It then continued,

> This observation compels our conclusion that possible deportation because of immigration status is not a proper consideration in criminal sentencing. If the district court were to consider deportation as a factor in its sentencing decision, it would be considering a possible collateral consequence in arriving at an appropriate sentence for the defendant. We conclude that consideration of a possible collateral consequence, which is beyond the control of the district court and which may or may not occur, is not a valid consideration in deciding whether to impose a presumptive sentence or to depart from the guidelines.

*Id.* at 484.

The logic of *Mendoza* is open to criticism. Since *Mendoza* was decided, both the United States Supreme Court and our court have recognized that immigration is not simply an inscrutable maze. There are circumstances when deportation is more than just a "possible" result of a criminal conviction; it can be a certainty. *Padilla v. Kentucky,* 559 U.S. 356, 368–69, 130 S. Ct. 1473, 1483 (2010); *Diaz,* 896 N.W.2d at 731–32. To say that probation should be granted because deportation "may or may not occur" is probably finessing the issue too much. And to treat immigration as simply a "collateral" consequence may no longer be realistic. *See Padilla,* 559 U.S. at 365–66, 130 S. Ct. at 1481–82; *Diaz,* 896 N.W.2d at 732. When the Massachusetts Supreme Judicial Court reversed its prior position on consideration of immigration consequences during sentencing, it pointed out that:

> Reasoning that immigration consequences are collateral to conviction, this court has held that a trial judge should not consider the potential immigration consequences in fashioning a sentence. This reasoning was undermined in *Padilla* when the Supreme Court declined to accept the view that immigration consequences are collateral to conviction. Therefore, our precedent that a trial judge cannot factor immigration consequences into sentencing is no longer good law.

*Commonwealth v. Marinho,* 981 N.E.2d 648, 660 n.19 (Mass. 2013) (citations omitted).[1]

In any event, we are persuaded that the principle announced in the cases other than *Mendoza* is the correct one. Immigration status per se is not a relevant sentencing factor, but immigration status may impact an otherwise relevant sentencing factor and, to that extent, may be

---

[1]Furthermore, as Avalos Valdez admits, the Minnesota Supreme Court has not adopted *Mendoza* but has instead expressly left open the extent to which possible deportation because of immigration status may be considered in sentencing. *State v. Kebaso,* 713 N.W.2d 317, 324 n.7 (Minn. 2006) (en banc).

considered. Such a procedure does not violate due process or equal protection. To the contrary, it complies with Iowa law, which requires the court to take into account all pertinent information in order to select the sentencing option that provides "maximum opportunity for the rehabilitation of the defendant, and for the protection of the community." Iowa Code § 901.5; *see also id.* § 907.5(1).

Several other points should be noted. Courts have at times relied on the effects of a defendant's immigration status in imposing a more *lenient* sentence. For example, in *State v. Silvera*, a sentencing panel imposed a sentence below the presumptive range so the defendant—a lawful permanent resident who had served in the United States Armed Forces and received an honorable discharge—would *not* be deported. 309 P.3d 1277, 1280–81 (Alaska Ct. App. 2013). The State challenged that sentence (and another in a companion case) as violating equal protection. The Alaska Court of Appeals disagreed, "[I]t was the harsh collateral consequences they faced if they were deported, not their status as non-citizens, that led the three-judge panel to conclude that sentencing the defendants within the presumptive range would be manifestly unjust in these cases." *Id.* at 1287. The practice approved in *Silvera* could not occur if the effects of immigration status could never be considered. *Cf. State v. Sanchez*, 346 P.3d 701, 704 (Utah Ct. App. 2015) (holding that the trial court was not required to consider the defendant's potential deportation and impose less than the standard sentence).

Also, if the ramifications of immigration status could not be considered in criminal sentencing, it would logically follow they would be off-limits in other types of proceedings, such as bail setting, child custody and termination of parental rights. We disagree with this result. *See In re Adoption of C.M.*, 414 S.W.3d 622, 669 (Mo. Ct. App. 2013) (explaining that

the mother's "immigration status properly played a part" in a termination-of-parental-rights proceeding); *Rico v. Rodriguez*, 120 P.3d 812, 818 (Nev. 2005) ("Although we recognize that Rico is entitled to due process and equal protection, she has simply not demonstrated that the district court's consideration of her immigration status violated her constitutional rights or was a primary factor in the determination of her children's best interests."); *State v. Fajardo-Santos*, 973 A.2d 933, 939 (N.J. 2009) ("When bail is set, it is entirely appropriate to consider a defendant's immigration status in evaluating the risk of flight or non-appearance."); *In re Dependency of J.B.S.*, 863 P.2d 1344, 1350 (Wash. 1993) (en banc) ("Although not dispositive, the trial court has discretion to consider [immigration status], insofar as it may affect the consequences of the placement decision.").

Immigration status is not a characteristic that can never be relevant to government action. For example, in *Sanchez v. State*, we held it did not violate the Equal Protection and Due Process Clauses of the Iowa and United States Constitutions for our state to deny driver's licenses to unauthorized aliens. 692 N.W.2d 812, 819–20 (Iowa 2005).

In order to carry out some legitimate public policies, such as optimizing the rehabilitation of a criminal offender, it may be necessary to consider matters such as the offender's living and job prospects, which may require consideration of that offender's immigration status. Ignoring those factors simply because they are attributable to immigration status could result in *disparate* treatment of a defendant because he or she is an unauthorized alien.

We now apply these principles to the present case. For that, we return to the court's statement of reasons for the sentence it imposed. Initially, the district court commented on the nature of the crime (involving

184 pounds of marijuana) and drew the plausible conclusions that Avalos Valdez could be considered a "danger to the community" and a "flight risk." The court then stated, "I don't think probation would be appropriate with pleading to this charge given his immigration status." But the court immediately explained further, "He won't be available if I were to award probation, as I understand it. So I don't think probation is an appropriate sentence here."

Reading the court's statement in its entirety, we think the court decided against probation for Avalos Valdez not because he was an unauthorized alien but because his immigration status meant he "[would not] be available" to undergo probation, as the court "underst[ood] it," and because of the quantity of marijuana involved. We do not see any constitutional defect in that ruling. The record indicated that Avalos Valdez would be taken into ICE custody and then deported as soon as he was no longer incarcerated. It is difficult to see how probation could have been implemented effectively for Avalos Valdez upon his deportation. Probation requires that the person be "committed to the custody, care, and supervision" of "the judicial district department of correctional services." Iowa Code § 907.8(2). How would that supervision occur once Avalos Valdez had been removed to Mexico? And how would the conditions of probation be enforced? Ordinarily, violations of probation are enforced as provided in chapter 908. *See id.* § 907.3(2)(*b*). This starts with an arrest and an initial appearance before a magistrate. *See id.* §§ 908.1, .2, .11. Notably, there is an "Interstate Compact for Adult Offender Supervision" in the Iowa Code, but no international compact. *See id.* § 907B.1.

We do not foreclose the possibility that in some future case a record could be developed showing that probation would be workable and proper

for a foreign national being deported to his or her home country. Avalos Valdez did not explain below, and does not explain in his briefing here, how such a probation could be implemented for him. Instead, his argument is largely abstract and academic. Accordingly, on this record we find no error.

### V.  Conclusion.

For the foregoing reasons, we affirm Avalos Valdez's conviction and sentence.

**AFFIRMED.**