SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Oscar Lopez-Carrera (A-8-20) (084750)**
**State v. Juan C. Molchor; State v. Jose A. Rios (A-9-20) (084694)**

**Argued November 30, 2020 -- Decided March 30, 2021**

**RABNER, C.J., writing for the Court.**

In these consolidated appeals, the Court considers whether the Criminal Justice Reform Act (CJRA or Act), N.J.S.A. 2A:162-15 to -26, empowers judges to detain defendants who are non-citizens to prevent immigration officials from removing them from the country before trial.

Defendants Juan Molchor and Jose Rios were arrested and charged with aggravated assault and criminal mischief. They allegedly punched and struck an acquaintance over the head with beer bottles at a party and damaged two cars as they left the party. Pretrial Services prepared Public Safety Assessments (PSAs) for both defendants. The PSAs rated both defendants 1 out of 6 for failure to appear, the lowest level of risk, and 2 out of 6 for new criminal activity. Neither defendant had any pending charges, prior convictions, prior failures to appear, or prior juvenile adjudications. Pretrial Services recommended that both be released with monthly reporting.

The State moved for pretrial detention, claiming defendants posed a flight risk because they were undocumented immigrants. The State presented no evidence that U.S. Immigration and Customs Enforcement (ICE) was interested in either defendant. The court ordered both defendants detained pretrial, noting that, but for their immigration status, both would likely have been released. In both detention orders, the court included a single finding to justify detention: "Particular circumstances, specifically, defendant is an illegal alien." The Appellate Division consolidated the cases and reversed. See 464 N.J. Super. 274 (App. Div. 2020). The Court granted leave to appeal. 244 N.J. 187 (2020).

Defendant Oscar Lopez-Carrera was charged with attempted sexual assault and criminal sexual contact in relation to an alleged attempted sexual assault of a minor. Like Molchor and Rios, Lopez-Carrera had no prior convictions or other pending charges, and no prior failures to appear. The PSA rated him at the lowest level of risk, 1 out of 6, for both failure to appear and new criminal activity. Pretrial Services recommended that Lopez-Carrera be released on his own recognizance. The State did not initially move for pretrial detention, and Lopez-Carrera was released on conditions. Immediately upon his

1

release, ICE officials took him into federal custody.  He was indicted months later.  Eight months after that, ICE informed prosecutors of the following:  Lopez-Carrera was the subject of a final removal order; his immigration appeals had been denied; and he would be removed from the country to Guatemala.  In his immigration appeal, Lopez-Carrera unsuccessfully sought a continuance to allow his criminal charges to be resolved.

The State promptly moved to revoke Lopez-Carrera's pretrial release based on the change in circumstances.  The trial court denied the motion, relying on the Appellate Division's recently published decision in Molchor.  The Appellate Division affirmed.  The State contacted ICE and asked for permission to apply for deferred action or an administrative stay of removal to delay Lopez-Carrera's removal from the country.  Counsel for ICE responded that the removal could not be delayed.  The Court granted leave to appeal.  244 N.J. 189 (2020).  One month later, Lopez-Carrera was removed from the United States to Guatemala.  The Court considers his appeal nonetheless because it raises an issue of significant public importance that is likely to recur.

**HELD:**  The CJRA favors pretrial release over detention; it authorizes judges to detain defendants when the State has shown, by clear and convincing evidence, that no conditions of release would reasonably assure the eligible defendant's appearance in court when required, would protect the public, or would prevent the defendant from obstructing the criminal justice process.  To make that determination, the Act directs judges to conduct an individualized assessment of the level of risk each defendant presents in light of their own conduct, history, and characteristics.  The Act does not seek to detain defendants whose behavior poses a minimal level of risk, which describes all three defendants here.  Nor does the CJRA cede control over pretrial release decisions to outside agencies.  The statute's primary focus is on a defendant's behavior and choices, and the risk they present.  The language, structure, purpose, and history of the CJRA reveal the Act was designed to address a defendant's own choice not to appear in court, not independent actions by third parties like ICE.  The Court agrees with the Appellate Division that the CJRA does not authorize judges to detain defendants to thwart their possible removal by ICE.

1.  The CJRA favors release with conditions, with detention reserved for defendants who pose a significant risk of non-appearance, danger, or obstruction.  N.J.S.A. 2A:162-15, -17, -18.  To enable judges to decide whether to release an individual, the CJRA provides for a careful, objective evaluation of the level of risk each defendant presents, taking into account information that relates largely to a defendant's conduct, history, and characteristics.  See id. at -20.  Pretrial Services officers are required to conduct an individualized risk assessment for each eligible defendant to make a recommendation to the court.  State v. Robinson, 229 N.J. 44, 56 (2017) (citing N.J.S.A. 2A:162-25(b)).  To that end, the Act directed that an objective risk assessment instrument be developed "based on analysis of empirical data and risk factors relevant to the risk of failure to appear in court when required and the danger to the community while on pretrial

2

release." N.J.S.A. 2A:162-26(c)(1).  The risk assessment instrument considers nine factors that also relate to a defendant's behavior, history, and characteristics.  See Robinson, 229 N.J. at 62.  With those objective details and other relevant information, Pretrial Services prepares a PSA that assesses a defendant's level of risk for failure to appear and for new criminal activity.  The PSA also recommends whether to release a defendant, and if so, what conditions of release to impose.  Ibid.  (pp. 18-22)

2.  To determine whether the CJRA authorizes judges to detain defendants who face possible removal, the Court begins with the Act's plain language, which provides for detention when no combination of conditions "would reasonably assure the eligible defendant's appearance in court when required."  N.J.S.A. 2A:162-18(a)(1) (emphasis added).  The CJRA does not specifically address whether or how judges may consider the intervention of immigration officials, but its text is revealing in other ways.  (pp. 23-24)

3.  "Appearance" commonly involves action.  A defendant's "appearance in court" thus commonly refers to the voluntary act of showing up.  Reading the term in the context of the Act reinforces that "appearance" implies a voluntary act by the defendant.  First, the other two grounds for detention set forth in N.J.S.A. 2A:162-18(a)(1) -- the risk the defendant might harm someone or obstruct justice -- plainly refer to a defendant's voluntary behavior, permitting the inference that "appearance" likewise refers to a defendant's voluntary act.  Second, the risk assessment tool and the statutory factors in N.J.S.A. 2A:162-20 focus on the behavior, characteristics, and history of each defendant.  Third, N.J.S.A. 2A:162-20(c)(1) invites judges deciding whether to detain a defendant pretrial to consider a defendant's "record concerning appearance at court proceedings."  That relates directly to a defendant's prior voluntary conduct and sheds light on the meaning of the words in section 18, as well as the Legislature's intent.  (pp. 24-26)

4.  To discern the intent of the Legislature, the Court also considers the meaning of the phrase "appearance in court when required," N.J.S.A. 2A:162-18(a)(1), in light of the statute's overall scheme and purpose.  At the outset of the CJRA, the Legislature declared the law "shall be liberally construed to effectuate the purpose of primarily relying upon pretrial release by non-monetary means."  N.J.S.A. 2A:162-15.  The Act reserves detention for defendants who pose a serious risk of non-appearance, danger, or obstruction.  See ibid.  Moreover, the Act empowers judges to implement its framework and decide the question of pretrial release.  (pp. 26-27)

5.  The State argues that pretrial detention is justified when a defendant's risk of removal is certain and imminent.  If that were the case, defendants could be detained no matter the nature and circumstances of their eligible offense, the strength of the evidence against them, their record of appearing in court in the past, their ties to and length of residence in the community, their past conduct, or other considerations the Legislature outlined.  See N.J.S.A. 2A:162-20.  To be clear, here the Court considers individuals who would not otherwise be subject to pretrial detention.  Under the State's argument, which assumes

that one can be certain when removal is imminent, the single determining factor would be whether immigration officials appeared likely to succeed in their efforts to remove an individual. Such an approach would effectively cede decisions on pretrial release to an outside agency and remove that authority from judges. Trial judges in those cases would in essence be compelled to enter an order of detention. The CJRA, as written, does not provide for that. In the language, structure, and purpose of the CJRA, the Court finds evidence that the Legislature intended to authorize pretrial detention when there is clear and convincing evidence that individual defendants pose a serious risk of non-appearance based on their own conduct, not the acts of third parties like ICE. (pp. 27-29)

6. The Legislature did not debate whether decisions by immigration officials could form the basis for pretrial detention. Three strands in the historical record, however, do shed light on the issue, and two of them imply that an order of detention should be based on a defendant's own behavior. The Court reviews all three strands in detail. (pp. 29-36)

7. The Court does not rely on case law that interprets the federal Bail Reform Act. The federal act differs from the CJRA in this area in two ways, including by expressly providing for consideration of immigration status. See 18 U.S.C. § 3142(d). The New Jersey Legislature declined to address immigration status in the CJRA despite looking to the federal act as a model. In the end, the issue here is about the interpretation of a state statute. The question is not whether the sovereign had the power to act; it is what the law -- as written -- actually authorizes. (pp. 36-37)

8. Another important concern influences the Court's analysis. A bedrock principle of our system of justice is that individuals charged with a crime are presumed innocent. For like reasons, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987). Detention statutes must be narrowly drawn to live up to those basic principles. Id. at 749-50. The Court reviews arguments about the complexities of the removal process and difficulties in predicting the likelihood of deportation, concluding that one thing seems apparent: If the Legislature were to ask judges to consider the likelihood of removal when they decide detention motions, it would be quite challenging to make accurate predictions. Yet judges can order detention only if they find that "clear and convincing evidence" requires that outcome. N.J.S.A. 2A:162-18(a). The legal standard and the realities of immigration proceedings are not easily reconciled. (pp. 37-40)

9. The Appellate Division correctly remanded the cases involving defendants Molchor and Rios to the trial court. At a hearing on remand, just as at an initial detention hearing, trial courts consider a host of factors to assess whether a defendant presents a risk of non-appearance. N.J.S.A. 2A:162-20. A defendant's family ties, length of residence in the community, and community ties all bear on the risk that an individual might choose not to appear in court. Ibid. Ties to another country can likewise inform a court's decision. But a person's immigration status alone cannot be dispositive. Courts must engage in a

4

fact-specific inquiry that looks beyond status because each person's circumstances -- citizens and non-citizens alike -- are different. Non-citizens who have lived here for years, gone to school here, raised families here, and established roots in their communities may pose only a minimal risk of non-appearance. Other non-citizens who arrived recently and have no such connections may pose a much greater risk of non-appearance. In State v. Fajardo-Santos, 199 N.J. 520, 531-32 (2009), the Court invited an inquiry into how non-citizen defendants facing immigration action will decide to respond to their obligation to appear in court, a question that status alone does not answer. But Fajardo-Santos pre-dates the CJRA and is not an interpretive aid for either the Act or the issue now on appeal. (pp. 40-43)

10. The Attorney General could not estimate how many non-citizen defendants who are not detained are deported each year. The State conceded the concern involves "a relatively small total number of cases" in the overall context of pretrial release. Prosecutors can and do seek to defer action and stay removal in appropriate cases so that the criminal process can be completed. It would be preferable for ICE to refrain from deporting defendants while they await trial for many reasons. If removal proceedings occur while a case is pending, the Court urges ICE officials to work with prosecutors to allow pending criminal charges to be resolved. (pp. 43-44)

**The judgment of the Appellate Division is AFFIRMED in both matters.**

**JUSTICE ALBIN** disagrees with the Court's holding on the grounds that it preempts the State's sovereign authority to prosecute certain defendant aliens for offenses committed in New Jersey and denies crime victims their rights. Justice Albin does not suggest that a detention order can be entered solely because of an alien's status but finds it a different matter when a final order of removal has been entered, no appeals are pending, and ICE has reported that a defendant's removal from the country is certain and imminent. In those circumstances, Justice Albin writes, the State has met its burden that no condition of release "would reasonably assure the eligible defendant's appearance in court when required." N.J.S.A. 2A:162-18(a)(1). In Justice Albin's view, that common-sense interpretation is consistent with the objectives of the CJRA, the State's exercise of its sovereign power, and New Jersey's Victim's Rights Amendment and Crime Victim's Bill of Rights. Justice Albin concludes that it is now for the Legislature to determine whether, in passing the CJRA, it intended to strip state courts of the power to enter detention orders that would prevent the removal of defendant aliens charged with committing crimes in New Jersey.

**JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in CHIEF JUSTICE RABNER's opinion. JUSTICE ALBIN, joined by JUSTICE PIERRE-LOUIS, filed a dissent in Lopez-Carrera and concurred in the judgment in Molchor and Rios.**

5

SUPREME COURT OF NEW JERSEY

A-8 September Term 2020

A-9 September Term 2020

084750 and 084694

State of New Jersey,

Plaintiff-Appellant,

v.

Oscar Lopez-Carrera,

Defendant-Respondent.

State of New Jersey,

Plaintiff-Appellant,

v.

Juan C. Molchor,

Defendant-Respondent.

_____

State of New Jersey,

Plaintiff-Appellant,

v.

Jose A. Rios,

Defendant-Respondent.

1

State v. Oscar Lopez-Carrera (A-8-20):
On appeal from the Superior Court,
Appellate Division.

State v. Juan C. Molchor; State v. Jose A. Rios
(A-9-20):  On appeal from the Superior Court,
Appellate Division, whose opinion is reported at
464 N.J. Super. 274 (App. Div. 2020).

Argued                      Decided
November 30, 2020        March 30, 2021

Paul Heinzel, Assistant Prosecutor, argued the cause for
appellant in State v. Lopez-Carrera (A-8-20) (Michael H.
Robertson, Somerset County Prosecutor, attorney; Paul
Heinzel, of counsel and on the briefs).

Andrew R. Burroughs argued the cause for respondent in
State v. Lopez-Carrera (A-8-20) (Bastarrika, Soto,
Gonzalez & Somohano, attorneys; Andrew R. Burroughs,
John T. Somohano, and Jerard A. Gonzalez, on the
briefs).

Dana R. Anton, Special Deputy Attorney General/Acting
Assistant Prosecutor, argued the cause for appellant in
State v. Molchor; State v. Rios (A-9-20) (Christine A.
Hoffman, Acting Gloucester County Prosecutor, attorney;
Dana R. Anton, of counsel and on the briefs).

Tamar Y. Lerer, Assistant Deputy Public Defender
argued the cause for respondent Jose A. Rios in State v.
Molchor; State v. Rios (A-9-20) (Joseph E. Krakora,
Public Defender, attorney; Tamar Y. Lerer, of counsel
and on the briefs).

Cristina L. Vazquez argued the cause for respondent Juan
C. Molchor in State v. Molchor; State v. Rios (A-9-20)
(Cristina L. Vazquez, on the brief).

Sarah C. Hunt, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey in State v. Lopez-Carrera (A-8-20) and State v. Molchor; State v. Rios (A-9-20) (Gurbir S. Grewal, Attorney General, attorney; Sarah C. Hunt, of counsel and on the briefs).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey in State v. Molchor; State v. Rios (A-9-20) (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom, on the brief).

Joanne Gottesman argued the cause for amici curiae Immigration Law Scholars and Clinical Professors in State v. Molchor; State v. Rios (A-9-20) (Rutgers Law School Immigrant Justice Clinic, Boston College Legal Services Civil Rights Clinic, and the Cardozo School of Law Kathryn O. Greenberg Immigration Justice Clinic, attorneys; Joanne Gottesman, Reena Parikh, Haiyun Damon-Feng, of the Washington bar, practicing pursuant to R. 1:21-3(c), and Mauricio E. Norõna, of the New York bar, admitted pro hac vice, on the brief).

Michael Noriega submitted a brief on behalf of amicus curiae Association of Criminal Defense Lawyers of New Jersey in State v. Lopez-Carrera (A-8-20) and State v. Molchor; State v. Rios (A-9-20) (Bramnick Rodriguez Grabas Arnold & Mangan, attorneys; Michael Noriega, on the brief, and Cristina Carreno, of counsel and on the brief).

Richard D. Pompelio submitted a brief on behalf of amicus curiae New Jersey Crime Victims' Law Center in State v. Lopez-Carrera (A-8-20) (New Jersey Crime Victims' Law Center, attorneys; Richard D. Pompelio, of counsel and on the brief).

Eric M. Mark submitted a brief on behalf of amicus curiae American Immigration Lawyers Association –

New Jersey Chapter in State v. Molchor; State v. Rios (A-9-20) (Eric M. Mark, on the brief).

CJ Griffin submitted a brief on behalf of amici curiae Make the Road New Jersey, Bangladeshi American Women's Development Initiative, Fair and Welcoming Communities Coalition of Somerset County, Faith in New Jersey, First Friends of New Jersey and New York, International Justice Project, MomsRising, National Coalition of Latino Officers, LatinoJustice PRLDEF, Latino American Legal Defense and Education Fund, Law Enforcement Action Partnership, Volunteer Lawyers for Justice, and Wind of the Spirit in State v. Molchor; State v. Rios (A-9-20) (Pashman Stein Walder Hayden, attorneys; CJ Griffin and Rachel E. Simon, on the brief).

Raquiba Huq submitted a brief on behalf of amicus curiae Legal Services of New Jersey in State v. Molchor; State v. Rios (A-9-20) (Legal Services of New Jersey, attorneys; Raquiba Huq, Rachel Salazar, and Melville D. Miller, Jr., on the brief).

Jennifer B. Condon submitted a brief amici curiae on behalf of National Immigration Project of the National Lawyers Guild, Immigrant Defense Project, and Harvard Law School Crimmigration Clinic in State v. Molchor; State v. Rios (A-9-20) (Seton Hall Law School Center for Social Justice, attorneys; Jennifer B. Condon, on the brief).

Susan G. Roy submitted a brief on behalf of amici curiae Round Table of Former Immigration Judges and Former Board of Immigration Appeals Members in State v. Molchor; State v. Rios (A-9-20) (Law Office of Susan G. Roy, attorneys; Susan G. Roy, on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

These consolidated appeals present a straightforward question:  whether the Criminal Justice Reform Act (CJRA or Act), N.J.S.A. 2A:162-15 to -26, empowers judges to detain defendants who are non-citizens to prevent immigration officials from removing them from the country before trial.[1]  The statute does not directly answer the question, and the Legislature did not debate the issue.  But the language, structure, purpose, and history of the CJRA reveal the Act was designed to address a defendant's own choice not to appear in court, not independent actions by third parties like the U.S. Immigration and Customs Enforcement (ICE).

The CJRA favors pretrial release of defendants over detention.  Id. at -15, -17.  The law authorizes judges to detain defendants when the State has shown, by clear and convincing evidence, that no conditions of release "would reasonably assure the eligible defendant's appearance in court when required," would protect the public, or would prevent the defendant from obstructing the criminal justice process.  Id. at -18(a) (emphasis added).  In other words, judges may detain defendants who present a substantial risk in any of those areas.

---

[1]  We use the term "non-citizens" in this opinion to refer to individuals who are subject to removal under federal law.  The word includes undocumented individuals as well as people who entered the country lawfully but are now in the United States in violation of federal law.

5

To make that determination, the Act directs judges to conduct an individualized assessment of the level of risk each defendant presents in light of their own conduct, history, and characteristics. See State v. Robinson, 229 N.J. 44, 54 (2017); N.J.S.A. 2A:162-20. The Act does not seek to detain defendants whose behavior poses a minimal level of risk, which describes all three defendants involved in these appeals. Nor does the CJRA cede control over pretrial release decisions to outside agencies. The statute's primary focus is on a defendant's behavior and choices, and the risk they present.

The language the Legislature placed in the CJRA supports that conclusion. The key word, "appearance," commonly points to acts or actions people choose to take, not decisions by others that may prevent someone from acting. Related provisions elsewhere in the Act, which offer context, reinforce the law's focus on a defendant's own conduct.

Parts of the legislative history likewise emphasize a defendant's voluntary behavior as the basis for pretrial detention. For example, a report on criminal justice reform that the Legislature relied on, as well as an interpretive statement for the voters that accompanied the proposed constitutional amendment to allow for pretrial detention, both focus on a defendant's choices, not conduct by others, as grounds for detention. The State and the Attorney General contend that an amendment to an earlier draft of the bill

6

conclusively demonstrates the Legislature authorized detention of defendants who might fail to appear in court through no act of their own. It does not. Other reasons more persuasively account for the amendment, which the Legislature itself did not explain.

Here, the question before the Court affects a relatively small number of cases. All of them involve individuals who would not otherwise be detained as high-risk defendants. In other words, the cases involve people whose own behavior and history do not present a serious risk of non-appearance, danger, or obstruction. Individuals would be detained solely because of their immigration status and the risk ICE might remove them -- a risk that is difficult to measure because removal decisions are highly discretionary and involve complex legal issues.

The record reveals the Legislature did not discuss or set a policy for those individuals. Although the Legislature looked to the federal Bail Reform Act when it drafted the CJRA, it chose not to include language about immigration status that appears in the federal statute.

Courts are obligated to give effect to the Legislature's intent, not to craft a policy on an issue the Legislature has not addressed. See State v. S.B., 230 N.J. 62, 67-68 (2017). We agree with the Appellate Division that the language of the Act, coupled with its history, does not authorize judges to detain

7

defendants to thwart their possible removal by ICE. We therefore affirm the judgment of the Appellate Division.

Federal law provides for coordination between federal prosecutors and immigration officials after a non-citizen is arrested. 18 U.S.C. § 3142(d). Our criminal justice system functions best when the State has an opportunity to present its proofs to try to enforce the law, when defendants who stand accused can defend themselves in court, and when victims and witnesses can be heard and treated with dignity and respect. We therefore encourage ICE to coordinate with State prosecutors and allow the criminal justice system to complete its work while charges are pending against non-citizens in state court.

## I.

### A.

On January 8, 2020, defendants Juan Molchor and Jose Rios were arrested and charged with second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), and fourth-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1). They allegedly punched and struck an acquaintance over the head with beer bottles at a party. The victim reportedly suffered a severe laceration and lost consciousness. As defendants left the party, they allegedly damaged two cars.

8

Pretrial Services prepared Public Safety Assessments (PSAs) for both defendants. The PSAs rated both defendants 1 out of 6 for failure to appear, the lowest level of risk, and 2 out of 6 for new criminal activity. Neither defendant had any pending charges, prior convictions, prior failures to appear, or prior juvenile adjudications. Pretrial Services recommended that both defendants be released with monthly reporting as a condition.

The State moved for pretrial detention in each case. The State claimed defendants posed a flight risk because they were undocumented immigrants. Although the State presented no evidence that ICE was interested in either defendant, the prosecutor argued that if they were detained by ICE, the victim would be deprived of any relief. The State also claimed defendants might retaliate against the victim because they lived within five minutes of him.

Defense counsel stressed defendants' clean history and low risk scores and asked the court to release both individuals. Counsel added that release conditions could include a no-contact order to protect the victim. In the case of defendant Molchor, counsel emphasized it was "extremely unfair" for the State to "dangl[e]" the possibility of an ICE detainer without having contacted ICE.

The trial court ordered Molchor and Rios detained pretrial. The court observed that Rios was "an admitted, undocumented illegal alien which raises

9

major concerns for whether he's going to be here to answer to these charges." The court made similar comments about Molchor. But for their immigration status, the court noted, both defendants would likely have been released. The judge also referred to the seriousness of the charges and expressed concerns about contact with the victim. In both written detention orders, the court included a single finding of fact to justify detention: "Particular circumstances, specifically, defendant is an illegal alien."

Defendants appealed, and the Appellate Division consolidated the two cases. In a thoughtful opinion by Judge Ostrer, the Appellate Division reversed and remanded both cases. State v. Molchor, 464 N.J. Super. 274, 280 (App. Div. 2020). In short, the Appellate Division concluded that "the risk of a defendant's failure to appear justifying detention [under the CJRA] must arise from the defendant's own misconduct, not the independent acts of a separate arm of government." Ibid.

The court found that the Act's plain language did not resolve the issue but, when read in context, could be "plausibly construe[d] . . . to require a defendant's volitional act" to justify detention. Id. at 289 (noting that other grounds for detention set forth in N.J.S.A. 2A:162-18 -- threatening safety or obstructing the criminal justice process -- require volitional acts).

10

The court also relied on the language of the interpretive statement to the constitutional amendment, which referred to a defendant's "return" to court -- a volitional act. Id. at 290 (citing S. Con. Res. 128, 216th Leg. (2014)). The Appellate Division found that a report of the Joint Committee on Criminal Justice, which the Legislature cited, lent further support in that the report focused on a defendant's pretrial misconduct as a way to measure a person's risk level. Ibid. The report notably equated "nonappearance" and "flight" as a single form of misconduct to be considered. Id. at 291.

The Appellate Division was not persuaded that an amendment to the bill -- which replaced a reference that a defendant "will flee" with "will not appear in court as required" -- implied that the Legislature intended "to authorize detention to manage the risk of a defendant's non-volitional failure to appear." Id. at 292. The Legislature did not explain the reason for the change, which "[c]onceivably" was meant to allow prosecutors to seek detention when defendants chose not to appear but did not flee. Ibid.

In addition, the court found support in federal case law that interpreted the federal Bail Reform Act. Id. at 293-95. Among other cases, the court cited United States v. Santos-Flores, 794 F.3d 1088, 1091 (9th Cir. 2015), for its holding that "the risk of nonappearance referenced in 18 U.S.C. § 3142 must involve an element of volition."

11

In the end, the Appellate Division "conclude[d] that the Legislature . . . intended that a defendant may be detained based on the risk of non-appearance only if it arises from the defendant's own misconduct or volitional act" -- and not "to thwart federal immigration action." Molchor, 464 N.J. Super. at 296.

The court remanded both cases for reconsideration and directed the trial judge "to weigh the risk of non-appearance arising only from defendants' own potential misconduct or volitional acts." Id. at 297. The Appellate Division also vacated the trial court's finding "that defendants posed an unmanageable risk" of retaliation to the alleged victim, which the record did not support, or that Rios posed a risk of danger. Ibid.

On July 10, 2020, after new detention hearings, Molchor and Rios were both released on conditions. The Appellate Division and this Court denied the State's emergent applications for a stay. The State's motion for a stay in the ordinary course was denied by both courts as well.

We granted the State's motion for leave to appeal. 244 N.J. 187 (2020). The Attorney General and the American Civil Liberties Union of New Jersey (ACLU) appeared as amici curiae before the Appellate Division and continued to participate in this appeal. See R. 1:13-9(d). We also granted a number of individual and joint applications to appear as amicus curiae.

12

B.

On June 12, 2019, defendant Oscar Lopez-Carrera was charged in a complaint with second-degree attempted sexual assault, N.J.S.A. 2C:5-1(a)(1) and 2C:14-2(c)(4), and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b).  The charges related to an alleged attempted sexual assault of a minor.  On or about the same day, ICE lodged a detainer against Lopez-Carrera.[2]

Like Molchor and Rios, Lopez-Carrera had no prior convictions or other pending charges, and no prior failures to appear.  The PSA rated him at the lowest level of risk, 1 out of 6, for both failure to appear and new criminal activity.  Pretrial Services recommended that Lopez-Carrera be released on his own recognizance.

The State did not initially move for pretrial detention, and Lopez-Carrera was released on conditions on June 13, 2019.  Immediately upon his release from county jail, ICE officials took him into federal custody, where he remained afterward.  A grand jury in Somerset County returned an indictment against defendant for essentially the same charges on October 2, 2019.

---

[2]  An ICE detainer "serves to advise another law enforcement agency that [ICE] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien.  The detainer is a request that such agency advise [ICE], prior to release of the alien, in order for [ICE] to arrange to assume custody . . . ."  8 C.F.R. § 287.7(a).

Eight months later, on June 9, 2020, ICE informed prosecutors of the following: Lopez-Carrera was the subject of a final removal order; his immigration appeals had been denied; and he would be removed from the country to Guatemala. In his immigration appeal, Lopez-Carrera unsuccessfully sought a continuance to allow his criminal charges to be resolved.

The State promptly moved to revoke Lopez-Carrera's pretrial release on June 11, 2020 based on the change in circumstances, pursuant to Rule 3:4A(b)(3). On July 16, 2020, the trial court denied the motion. Relying on the Appellate Division's recently published decision in Molchor, the trial court explained that Lopez-Carrera's risk of non-appearance arose from the federal government's intervention, not defendant's own volitional acts.

The same day, the State sought leave to file an emergent appeal and certified that Lopez-Carrera would be deported to Guatemala on the next available flight. The Appellate Division granted leave to appeal and summarily affirmed the trial court's order, citing Molchor. We denied the State's emergent application for a stay on July 24, 2020.

The State then contacted ICE and asked for permission to apply for deferred action or an administrative stay of removal to delay Lopez-Carrera's

14

removal from the country.  Counsel for ICE responded that the removal could not be delayed.

We granted leave to appeal on September 21, 2020.  244 N.J. 189 (2020).  We also granted several applications to appear as amicus curiae.

On October 21, 2020, Lopez-Carrera was removed from the United States to Guatemala.  We consider his appeal nonetheless because it raises an issue "of significant public importance [that] is likely to recur."  State v. Cassidy, 235 N.J. 482, 491 (2018) (quoting State v. Gartland, 149 N.J. 456, 464 (1997)).

## II.

Because the parties' arguments are substantially similar in all three cases, we consider them together.

The State argues that the Appellate Division improperly imposed a volitional act requirement on the CJRA, which neither the plain language nor the legislative history of the statute established.  Such a requirement, the State contends, would allow defendants to be removed before they could be brought to justice.  The State argues that when a defendant's deportation becomes "certain and imminent," pretrial detention is warranted to "reasonably assure the eligible defendant's appearance in court," consistent with N.J.S.A. 2A:162-18(a).  The State, as well as other advocates, offers a multi-part test to

15

determine when removal is sufficiently certain and imminent to justify detention.

The Attorney General, as an amicus, largely echoes the State's position. The Attorney General stresses that courts should focus on the likelihood that a defendant will appear at trial, not who is to blame for a defendant's failure to appear.

Defendants counter that the Appellate Division properly interpreted the CJRA. They contend that the risk of non-appearance in the statute does not encompass the risk of deportation; it extends only to the risk that a defendant will voluntarily choose to not appear. Defendants add that state court judges are not equipped to evaluate the risk of deportation because of the complexities of immigration law and the immense amount of discretion ICE has.

The ACLU supports defendants' position. The ACLU emphasizes the Act does not permit pretrial detention on the basis that defendants may be forced to miss a court date against their will. The ACLU also contends that allowing pretrial detention based solely on immigration status raises serious constitutional concerns.

The Association of Criminal Defense Lawyers of New Jersey, as amicus, likewise agrees with the Appellate Division's analysis. In addition, the

16

Association asks the Court to adopt a rule that would permit defendants subject to removal to stipulate to pretrial detention.

Other amici presented thoughtful submissions as well. The New Jersey Crime Victims' Law Center, like the State, argues that the Appellate Division's ruling will result in manifest injustice to victims and fails to respect their rights.

A group of fifty immigration law scholars and clinical professors (Professors), and a second group of twenty-five former immigration judges and members of the Board of Immigration Appeals (Former Judges), submitted comprehensive overviews of the immigration process. They highlight the complex, dynamic, and discretionary nature of the removal process and argue that state trial courts are ill-equipped to evaluate a defendant's likelihood of removal, which is too speculative even for experts to predict. They submit that a civil immigration detainer, like an individual's immigration status, is not a reliable indicator that a person will be removed from the country.

The American Immigration Lawyers Association (AILA) and the National Immigration Project of the National Lawyers Guild, the Immigrant Defense Project, and the Harvard Law School Crimmigration Clinic echo concerns about how difficult it is to forecast the risk of removal for a non-citizen. AILA adds that permitting pretrial detention based on a person's risk

17

of removal will have the disproportionate effect of incarcerating low-level offenders, the vast majority of whom are recommended for release under the CJRA.

Finally, Legal Services of New Jersey (LSNJ) and Make the Road New Jersey, joined by twelve other organizations (Make the Road), highlight the consequences of pretrial detention for non-citizens, their families, and their communities. LSNJ also challenges the need for pretrial detention given the avenues non-citizens have to resolve their criminal cases while in ICE custody. Make the Road adds that allowing pretrial detention based on immigration status undermines trust in law enforcement in immigrant communities and makes it harder for law enforcement to investigate and prosecute crimes.

### III.

The CJRA marked a significant change in New Jersey's approach to pretrial release. Previously, the criminal justice system relied heavily on the use of monetary bail. The new law favors release with conditions, with detention reserved for defendants who pose a significant risk of non-appearance, danger, or obstruction. N.J.S.A. 2A:162-15, -17, -18.

To enable judges to decide whether to release an individual, the CJRA provides for a careful, objective evaluation of the level of risk each defendant presents. See Robinson, 229 N.J. at 54. We reviewed the Act's purpose and

18

provisions in <u>Robinson</u>.  <u>See</u> <u>id.</u> at 52-62.  In this appeal, we briefly recount aspects of the CJRA that concern pretrial detention.

As noted earlier, the Act relies primarily on pretrial release, accompanied by non-monetary conditions, to "reasonably assure" three aims: (1) a defendant's "appearance in court when required"; (2) that the defendant will not endanger "the safety of any other person or the community"; and (3) that the defendant "will not obstruct or attempt to obstruct the criminal justice process."  N.J.S.A. 2A:162-15.  When a prosecutor files a motion, a court may order pretrial detention if it finds by "clear and convincing evidence" that no combination of conditions would reasonably achieve those aims.  N.J.S.A. 2A:162-15, -18(a).

A prosecutor may seek pretrial detention when a defendant has been charged with one of a number of serious offenses listed in the statute.  <u>See</u> N.J.S.A. 2A:162-19(a)(1) to (a)(6).  In addition, prosecutors can move for pretrial detention for any other offense if -- tracking the above language -- they "believe[] there is a serious risk that" the defendant "will not appear in court as required," "will pose a danger to any other person or the community," or "will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure or intimidate, a prospective witness or juror."  N.J.S.A. 2A:162-19(a)(7).

19

To assess a motion for detention, the trial court "may take into account information" that relates largely to a defendant's conduct, history, and characteristics:

    a. The nature and circumstances of the offense charged;

    b. The weight of the evidence against the eligible defendant, except that the court may consider the admissibility of any evidence sought to be excluded;

    c. The history and characteristics of the eligible defendant, including:

        (1) the eligible defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

        (2) whether, at the time of the current offense or arrest, the eligible defendant was on probation, parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal law, or the law of this or any other state;

    d. The nature and seriousness of the danger to any other person or the community that would be posed by the eligible defendant's release, if applicable;

    e. The nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process that would be posed by the eligible defendant's release, if applicable; and

20

f. The release recommendation of the pretrial services program obtained using a risk assessment instrument . . . .

[N.J.S.A. 2A:162-20.]

Section 25 of the Act establishes a statewide Pretrial Services Program. Pretrial Services officers are required to conduct an individualized risk assessment for each eligible defendant in order to make a recommendation to the court. Robinson, 229 N.J. at 56 (citing N.J.S.A. 2A:162-25(b)). To that end, the Act directed that an objective risk assessment instrument be developed -- "based on analysis of empirical data and risk factors relevant to the risk of failure to appear in court when required and the danger to the community while on pretrial release" -- for Pretrial Services officers to use. N.J.S.A. 2A:162-26(c)(1).

The risk assessment instrument considers nine factors that also relate to a defendant's behavior, history, and characteristics:

(1) the defendant's age at the time of the current offense; (2) whether the offense is violent and, if so, whether the defendant is age 20 or older; (3) any additional pending charge(s) at the time of the current offense; and whether the defendant has any prior (4) disorderly persons convictions, (5) indictable convictions, (6) violent convictions, (7) failures to appear pretrial in the past two years or (8) more than two years ago, or (9) sentences of incarceration of fourteen days or more.

21

[Robinson, 229 N.J. at 62.]

With the above objective details and other relevant information, Pretrial Services prepares a PSA that assesses a defendant's level of risk on two scales: for failure to appear and for new criminal activity. Ibid. The PSA also recommends whether to release a defendant, and if so, what conditions of release to impose. Ibid. Once again, section 20 of the Act expressly authorizes a court to consider "[t]he release recommendation of the pretrial services program obtained using [the] risk assessment instrument." N.J.S.A. 2A:162-20(f).

## IV.

We rely on settled principles of statutory construction to determine the meaning and scope of the CJRA.

The goal of all statutory interpretation is "to determine and give effect to the Legislature's intent." In re Registrant H.D., 241 N.J. 412, 418 (2020) (quoting DYFS v. A.L., 213 N.J. 1, 20 (2013)). Courts start with the plain language of the statute, "which is typically the best indicator of intent." State v. McCray, 243 N.J. 196, 208 (2020) (quoting In re T.B., 236 N.J. 262, 274 (2019)). And courts must give words "their generally accepted meaning." N.J.S.A. 1:1-1.

A statute's words and phrases should also "be read and construed with their context." Ibid. We do not read them in isolation; we instead consider "them in context with related provisions so as to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492 (2005).

If the language of a statute is clear, a court's task is complete. McCray, 243 N.J. at 208. If the text is ambiguous, courts may consider extrinsic materials, including legislative history, committee reports, and other sources, to discern the Legislature's intent. In re Ridgefield Park Bd. of Educ., 244 N.J. 1, 18 (2020).

V.

A.

To determine whether the CJRA authorizes judges to detain defendants who face possible removal by immigration officials, we begin with the plain language of the Act. Once again, the relevant text provides for detention when no combination of conditions "would reasonably assure the eligible defendant's appearance in court when required." N.J.S.A. 2A:162-18(a)(1) (emphasis added).

Unlike the law's federal counterpart, which we briefly consider later, the CJRA does not specifically address whether or how judges may consider the intervention of federal immigration officials. Cf. 18 U.S.C. § 3142(d)(1)(B)

23

(authorizing federal judges to temporarily detain certain non-citizens who may flee or pose a danger, for up to ten days, so that immigration officials can decide whether to take the person into custody during that time).  The CJRA's text is revealing in other ways, though, starting with the ordinary meaning of the language the Legislature used.

"Appearance" commonly involves action.  Webster's Third New International Dictionary, for example, defines the term as "the act, action or process of appearing" -- as in, "the act or action of coming before the public," "the act or action of coming formally before an authoritative body," "the coming into court of either of the parties to a suit," and "the coming into court of a party summoned in an action."  Webster's Third New Int'l Dictionary (Unabridged) 103 (1981); see also Black's Law Dictionary 122 (11th ed. 2019) (defining "appearance" as "[a] coming into court as a party or interested person . . . esp., a defendant's act of taking part in a lawsuit"); Ballentine's Law Dictionary 82 (3d ed. 1969) (defining "appearance" as "the overt act by which [a defendant] submits himself to the court's jurisdiction").

A defendant's "appearance in court" thus commonly refers to the voluntary act of showing up.  Consistent with N.J.S.A. 1:1-1, words and phrases in a statute must not only be given their "generally accepted meaning,"

24

they must also be considered in context. Viewed in that way, the use of "appearance" in the CJRA again implies a voluntary act by the defendant.

The statute lists three grounds for detention in a single sentence: to reasonably assure a "defendant's appearance in court," "the protection" of the public, and "that the eligible defendant will not obstruct or attempt to obstruct the criminal justice process." N.J.S.A. 2A:162-18(a)(1). The second and third phrases plainly refer to a defendant's voluntary behavior -- the risk the defendant might harm someone or obstruct justice. Those phrases offer context for the word "appearance" and permit an inference that the term likewise refers to a defendant's voluntary act of showing up in court as required. See Molchor, 464 N.J. Super. at 289.

Other parts of the statute reinforce the conclusion that the Act addresses a defendant's own choices. The law is painstakingly designed to measure and manage the level of risk each defendant presents. In that regard, as discussed earlier, the CJRA called for the development of a nuanced risk assessment instrument "based on analysis of empirical data and risk factors relevant to the risk of failure to appear in court," among other concerns. N.J.S.A. 2A:162-25(c)(1). The tool, as noted, assesses the behavior, characteristics, and history of each defendant. See Robinson, 229 N.J. at 62. Neither the tool nor the

25

statutory factors listed in section 20 of the CJRA measure actions by third parties such as ICE. See ibid.; N.J.S.A. 2A:162-20.

The factors the Legislature included in section 20 likewise call upon judges to consider a defendant's conduct, history, and relationships. One factor is particularly telling. The law invites judges, when they are deciding whether to detain a defendant pretrial, to consider a defendant's "record concerning appearance at court proceedings." N.J.S.A. 2A:162-20(c)(1) (emphasis added). Here, more plainly than in section 18, the phrase the Legislature repeated relates directly to a defendant's prior voluntary conduct. The related language in section 20 sheds light on the meaning of the words in section 18 -- and on the Legislature's intent. See Gilleran v. Township of Bloomfield, 227 N.J. 159, 172 (2016) (noting statutory words should be considered in context with related provisions).

## B.

To discern the intent of the Legislature, we also consider the meaning of the phrase "appearance in court when required," N.J.S.A. 2A:162-18(a)(1), in light of the statute's overall scheme and purpose, see Merin v. Maglaki, 126 N.J. 430, 436 (1992).

At the outset of the CJRA, the Legislature declared the law "shall be liberally construed to effectuate the purpose of primarily relying upon pretrial

26

release by non-monetary means." N.J.S.A. 2A:162-15. Defendants charged with certain eligible, serious offenses can be held in custody. Id. at -19(a)(1) to (a)(6).[3] In those serious matters, a judge, after considering various relevant factors, must find clear and convincing evidence to justify detention. See id. at -18(a)(1), -18(b), -19, -20. A presumption of detention, which can be rebutted, exists only for cases in which the court finds probable cause that defendants committed murder or a crime that subjects them to a sentence of life imprisonment. Id. at -19(b).

The law's graduated scheme serves the Legislature's stated aim: to rely primarily on pretrial release and reserve detention for defendants who pose a serious risk of non-appearance, danger, or obstruction. See id. at -15. Moreover, the Act empowers judges to implement its framework and decide the question of pretrial release.

The State argues that pretrial detention is justified when a defendant's risk of removal is certain and imminent. If that were the case, defendants could be detained no matter the nature and circumstances of their eligible

---

[3] The statute contains a catch-all provision at N.J.S.A. 2A:162-19(a)(7), which provides for the possibility of detention for any crime if the prosecutor believes there is a serious risk of non-appearance, danger, or obstruction. But aside from certain listed offenses under section 19(a)(6), it is not common for someone charged with a fourth-degree offense, for example, to be detained unless the surrounding circumstances are serious. See In re Request to Release Certain Pretrial Detainees, ___ N.J. ___, ___ (2021) (slip op. at 7).

27

offense, the strength of the evidence against them, their record of appearing in court in the past, their ties to and length of residence in the community, their past conduct, or other considerations the Legislature outlined. See id. at -20.

To be clear, we are considering individuals who would not otherwise be subject to pretrial detention. Under the State's argument, which assumes that one can be certain when removal is imminent, the single determining factor would be whether immigration officials appeared likely to succeed in their efforts to remove an individual. Such an approach would effectively cede decisions on pretrial release to an outside agency and remove that authority from judges. Trial judges in those cases would in essence be compelled to enter an order of detention. The CJRA, as written, does not provide for that.

The logical scope of the State's argument raises a related concern. Under its view, acts and decisions of others can provide a basis to detain a defendant -- a notion that could extend beyond immigration proceedings, as defendant Rios and the ACLU note. For example, suppose a defendant presented a minimal risk of danger, non-appearance, or obstruction, but faced a threat of harm from others. Could a court detain the person because others might harm him and prevent his return to court? If so, could the defendant later ask to be released because the danger had gone away? No fair reading of the statute allows for that type of analysis or outcome, which, like removal by

28

ICE, depends entirely on the behavior of third parties. Instead, the CJRA ties detention to a defendant's voluntary acts and related factors.

In both of the above situations, the State's interpretation of the CJRA would also run counter to the law's command to liberally construe the statute in favor of pretrial release. Id. at -15.

In the language, structure, and purpose of the CJRA, we find evidence that the Legislature intended to authorize pretrial detention when there is clear and convincing evidence that individual defendants pose a serious risk of non-appearance based on their own conduct, not the acts of third parties like ICE. But because the statute does not expressly mention the risk of removal by immigration authorities, and is arguably ambiguous for that reason, we consider the Act's legislative history as well.

## C.

The legislative history of the CJRA makes clear that the Legislature did not debate whether decisions by immigration officials could form the basis for pretrial detention. Three strands in the historical record, however, do shed light on the issue, and two of them imply that an order of detention should be based on a defendant's own behavior.

First, the enactment of the CJRA followed an extensive report from the Joint Committee on Criminal Justice. See Robinson, 229 N.J. at 53-54. The

29

broad-based Committee was comprised of various stakeholders in the criminal justice system; its membership included representatives of the Executive branch, the State Senate, and the Assembly. Id. at 53; Report of the Joint Committee on Criminal Justice 97 (Mar. 10, 2014), https://www.njcourts.gov/courts/assets/criminal/finalreport3202014.pdf (JCCJ Report).

The Committee examined and recommended changes to the State's criminal justice system -- specifically, the need for bail reform and a speedy trial act. Robinson, 229 N.J. at 53-54; JCCJ Report at 1. The Legislature, in turn, adopted many of the reforms proposed in the JCCJ Report. Compare JCCJ Report at 8-9, with N.J.S.A. 2A:162-15 to -26; see also S. Budget & Appropriations Comm. Statement to S. 946 1 (June 5, 2014) (explicitly referring to the JCCJ Report); Assemb. Judiciary Comm. Statement to A. 1910 1 (June 12, 2014) (same).

The JCCJ Report focused at length on the topic of pretrial release. See JCCJ Report at 1-4, 8, 11-68. Among other guiding principles, the Report observed that a "defendant's pretrial freedom" can be "restricted to respond to risks of pretrial misconduct." Id. at 14. "Pretrial misconduct," the report explained, "takes two forms: (1) "nonappearance in court when required (hereinafter 'flight') and (2) commission of additional crimes, witness

30

intimidation or witness retaliation, while released and awaiting trial (hereinafter 'community danger')." Ibid. (emphases added).  In short, the report expressly equated "nonappearance in court" with "flight."  Ibid.

The Report went on to recommend a framework to identify and manage those "risks of pretrial release misconduct."  Id. at 15-16, 18.  The proposal included the use of individualized risk assessments, id. at 57-61, and pretrial detention for "defendants who present unmanageable risks of pretrial misconduct," id. at 62.  The CJRA, in turn, used language similar to what appears in the Report.  For example, as noted before, the Act provides for detention to reasonably assure a defendant's "appearance in court when required," N.J.S.A. 2A:162-18(a) -- language the Report treated as synonymous with "flight," JCCJ Report at 14.

The second strand of legislative history relates to the same point.  When the CJRA was first introduced on January 27, 2014, it provided for detention to "ensure the defendant's appearance as required," S. 946 § 4(a) (as introduced, Jan. 27, 2014), and authorized prosecutors to move for detention in "case[s] that involve[] a serious risk that the defendant will flee," id. § 5(a)(2)(a).  An accompanying statement by the Senate Judiciary Committee used the term "flee" in the same context.  See S. Judiciary Comm. Statement to S. 946 1 (Mar. 24, 2014).

An amended bill dated June 5, 2014 stated prosecutors could seek detention if they "believe[] there is a serious risk that the defendant will not appear in court as required." S. 946 § 6(a)(6)(a) (First Reprint, June 5, 2014). In other words, the revised bill substituted the phrase "will not appear in court as required" for "will flee." Ibid. The bill, reported by the Senate Budget and Appropriations Committee, offered no reason for the change. See generally S. Budget & Appropriations Comm., Statement to S. 946 (June 5, 2014). The revised language remained in the final version of the Act. See L. 2014, c. 31, § 5(a)(7)(a).

The State and the Attorney General argue the removal of the reference to flight confirms the Legislature did not intend to create a volitional act requirement in the CJRA. They maintain the amendment is significant and permits judges to consider all circumstances that would prevent a defendant from standing trial.

The meaning of the amendment, though, is far from clear. As the Appellate Division noted, the revised language "[c]onceivably" reveals the Legislature intended to expand the grounds for detention beyond cases of flight to include defendants who simply choose to remain at home and not appear in court. Molchor, 464 N.J. Super. at 292.

Recent data reveals that happens often. The CJRA went into effect in 2017. Robinson, 229 N.J. at 55. For that full year, the court appearance rate for defendants, out of tens of thousands of cases, was 89.4% -- three percentage points lower than in 2014, when the rate was 92.7%. New Jersey Courts, 2018 Report to the Governor and the Legislature 14-15, 18 (2018), https://njcourts.gov/courts/assets/criminal/2018cjrannual.pdf?c=taP. Yet the data shows that defendants, in general, did not flee, because their cases were disposed of in roughly the same amount of time as before. Id. at 15-16. About 80% of cases that began in 2014 were completed within 22 months; about 78% that began in 2017 were completed in the same time frame. Ibid.

In other words, despite missing one or more court appearances, defendants generally did not flee. They returned to court to resolve their cases. Prosecutors can seek to detain those defendants under the CJRA; they could not under the initial draft of the bill. Compare N.J.S.A. 2A-162:19(a)(7)(a) (permitting prosecutors to seek detention when there is a serious risk the defendant "will not appear in court as required"), with S. 946 § 5(a)(2)(a) (as introduced, Jan. 27, 2014) (permitting prosecutors to seek detention when there is a serious risk that a defendant "will flee").

At oral argument, the Attorney General acknowledged that the number of defendants who do not to appear in court because they voluntarily absent themselves -- but do not flee -- far outpaces the number who are deported.

There may also be a simpler explanation for the amendment, which can be gleaned from the timeline. Between January and June 2014 -- when the Legislature changed the risk that a defendant "will flee" to "will not appear in court as required" as a basis for a prosecutor to seek detention -- the JCCJ issued its report. The March 10, 2014 report equated the two phrases. JCCJ Report at 14. It is possible, then, that the Legislature meant very little when it substituted words that were considered interchangeable.

Ultimately, we cannot discern the precise reason for the change because none was offered. But in light of the above history and timeline, it can hardly be said the amendment presents conclusive proof the Legislature wanted to permit pretrial detention of defendants who might not appear in court through no choice of their own.

The Legislature also used different language when it proposed a constitutional amendment -- on which the CJRA was conditioned -- to allow for pretrial detention. Robinson, 229 N.J. at 54; see also L. 2014, c. 31, § 21. This third strand of legislative history, the proposed amendment that the voters approved, eliminated the right to bail in the Constitution. S. Con. Res. 128 § 1

(2014) (enacted and incorporated at <u>N.J. Const.</u> art. I, ¶ 11). In its place, the amendment provided defendants a right "to be eligible for pretrial release," which could be denied if a court found that no "conditions would reasonably assure the person's appearance in court when required, or protect the safety of any other person or the community, or prevent the person from obstructing or attempting to obstruct the criminal justice process." <u>Ibid.</u>

The Legislature crafted an interpretive statement for voters to review alongside the proposed amendment. The statement on the ballot explained courts would have "the option of ordering a person to remain in jail in some situations" -- namely, "[t]he court could order such detention based upon concerns that the person, if released: <u>will not return to court</u>." <u>Id.</u> § 3(b) (emphasis added).

Here, again, the word "return" commonly refers to a person's own actions -- not the behavior of others that may prevent someone from acting. <u>See</u> <u>Merriam-Webster's Collegiate Dictionary</u> 1065 (11th ed. 2003) (defining "return" as "to go back or come back again" and "the act of coming back to or from a place or condition"); <u>New Oxford American Dictionary</u> 1493 (3d ed. 2010) (defining "return" as to "come or go back to a place or person" and "an act of coming or going back to a place or activity"). Voters were asked about

35

detaining someone who "will not return to court," not someone who "will not be in a position to return to court" because of a third party.

We do not rely on federal case law that interprets the federal Bail Reform Act in this instance. The Legislature looked to the Bail Reform Act when drafting the CJRA, as noted in Robinson, 229 N.J. at 56, and federal law, like the CJRA, permits judges to detain a defendant when "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1); see also N.J.S.A. 2A:162-18(a). But the Bail Reform Act differs from the CJRA in this area in two ways.

First, unlike the CJRA, the federal statute expressly provides for consideration of immigration status. It empowers judges to detain certain non-citizens temporarily if the court "determines that the person may flee or pose a danger." 18 U.S.C. § 3142(d). Immigration officials, who are notified by the prosecution, then have ten days to decide whether to take the person into custody. Ibid. If ICE chooses not to do so, the defendant is assessed for pretrial detention like any other defendant would be. Ibid. The Legislature, however, declined to explicitly address immigration status in the CJRA despite looking to the federal act as a model.

The CJRA and federal law differ in another way as well: the Bail Reform Act authorizes prosecutors to move for pretrial detention if there is a serious risk the defendant "will flee." 18 U.S.C. § 3142(f)(2)(A); but cf. N.J.S.A. 2A:162-19(a)(7)(a) (authorizing prosecutors to seek detention when they believe there is a serious risk the defendant "will not appear in court as required"). Because of those differences, we do not consider federal case law interpreting the Bail Reform Act to resolve the issue in this appeal.

In the end, the issue here is about the interpretation of a state statute. The question is not whether the sovereign had the power to act; it is what the law -- as written -- actually authorizes.

## VI.

Another important concern influences our analysis. A bedrock principle of our system of justice is that individuals charged with a crime are presumed innocent. See In re Winship, 397 U.S. 358, 363 (1970) (quoting Coffin v. United States, 156 U.S. 432, 453 (1895)). For like reasons, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987).

Detention statutes must be narrowly drawn to live up to those basic principles. See id. at 749-50 (upholding the constitutionality of the Bail Reform Act because it "narrowly focuses on a particularly acute problem in

37

which the Government interests are overwhelming"). The CJRA, like federal law, therefore requires that a heightened standard be met before a person can be detained pretrial: a finding by clear and convincing evidence that no combination of conditions would reasonably guard against the risk of non-appearance, danger, or obstruction. N.J.S.A. 2A:162-18(a); see also 18 U.S.C. § 3142(f).

The Public Defender and amici emphasize that decisions relating to the removal of non-citizens are highly discretionary and involve complex legal issues, making the risk of deportation extremely difficult to predict. The extensive review of the immigration process presented by the Professors, Former Judges, and the Public Defender reveals that various factors can influence whether and when a non-citizen will actually be deported -- ranging from ICE's exercise of discretion, to the defenses and opportunities for relief available to a particular non-citizen; from different legal and practical hurdles that can make it difficult to execute a final order of removal, to the backlog in immigration courts; and more. According to amici, it is difficult even for experts to predict whether an individual will likely be deported.

A number of parties and advocates suggest multi-factor tests to gauge the likelihood of deportation. The State proposes a three-factor test.[4] The Public Defender, on behalf of defendant Rios, argues that removal cannot trigger detention under the CJRA but offers six factors to consider in the alternative.[5] The ACLU agrees that decisions by immigration officials cannot justify detention under the Act but proposes seven factors in the alternative.[6] The Professors suggest there are yet more considerations those tests do not cover.

---

[4] The State contends that deportation is "certain and imminent" when three conditions are satisfied: (1) there is a final order of removal that has not been stayed; (2) the defendant has exhausted all appeals and no forms of collateral relief are pending; and (3) ICE has obtained travel documents for the defendant.

[5] The Public Defender proposed these factors in its brief and at oral argument: (1) there is a final order of removal that has not been stayed; (2) the defendant has no pending appeals or collateral challenges to the removal order; (3) the defendant is in ICE custody; (4) ICE has obtained appropriate travel documents; (5) a flight has been scheduled to the receiving country; and (6) the State has exhausted all of its options to guarantee the defendant's appearance at trial.

[6] The ACLU presented these factors in its brief and at oral argument: (1) there is a final order of removal that has not been stayed; (2) the defendant has no pending appeals or collateral challenges to the removal order; (3) ICE has obtained travel documents; (4) the defendant is in ICE custody; (5) the State has made a sufficient effort to forestall removal; (6) ICE has obtained a ticket for a flight; and (7) the defendant is charged with a serious crime.

One thing seems apparent. If the Legislature were to ask judges to consider the likelihood of removal when they decide detention motions, it would be quite challenging, to say the least, for judges, prosecutors, and defense attorneys -- many of whom are unfamiliar with immigration law and practice -- to make accurate predictions. Yet judges can order detention only if they find that "clear and convincing evidence" requires that outcome. N.J.S.A. 2A:162-18(a). The legal standard and the realities of immigration proceedings are not easily reconciled.

### VII.

The Appellate Division correctly remanded the cases involving defendants Molchor and Rios to the trial court "to weigh the risk of non-appearance arising only from defendants' own potential misconduct or volitional acts." Molchor, 464 N.J. Super. at 297. Those hearings have been completed, and both defendants were released on conditions.

At a hearing on remand, just as at an initial detention hearing, trial courts consider a host of factors to assess whether a defendant presents a risk of non-appearance. N.J.S.A. 2A:162-20. A defendant's family ties, length of residence in the community, and community ties all bear on the risk that an individual might choose not to appear in court. Ibid. Ties to another country can likewise inform a court's decision.

40

To be clear, a person's immigration status alone cannot be dispositive. See Molchor, 464 N.J. Super. at 297 ("[A] defendant's immigration status alone can rarely if ever justify a finding that the defendant poses a risk of flight."). Courts must engage in a fact-specific inquiry that looks beyond status because each person's circumstances -- citizens and non-citizens alike -- are different. Non-citizens who have lived here for years, gone to school here, raised families here, and established roots in their communities may pose only a minimal risk of non-appearance. Other non-citizens who arrived recently and have no such connections may pose a much greater risk of non-appearance.

In State v. Fajardo-Santos, we found that courts could "consider a defendant's immigration status in evaluating the risk of flight or non-appearance." 199 N.J. 520, 531 (2009). In doing so, we pointed to the impact of immigration status and the filing of a detainer on a person's decision whether to appear in court. We noted that some defendants faced with "a greater prospect of removal will have an additional incentive not to appear," while others "might be more determined to clear their name and vigorously contest removal to remain with family members in the United States." Id. at 531-32. To be clear, we intended, then and now, to invite an inquiry into how non-citizen defendants facing immigration action will decide to respond to

41

their obligation to appear in court, a question that status alone does not answer. Aside from concerns about the risk of danger or obstruction, the key question for the court is whether a defendant will choose to appear, not what the person's immigration status is.

The decision in Fajardo-Santos concluded that judges could increase bail for a non-citizen who was subject to an ICE detainer. Id. at 523, 532. As noted earlier, various amici and the Public Defender persuasively argue that the existence of a detainer or the start of removal proceedings does not mean that removal is either highly likely or imminent. In Fajardo-Santos, we did not have the benefit of the helpful briefs submitted in this appeal, and the decision overstated the significance of the filing of a detainer in the removal process. See id. at 523, 531. ICE agents -- not judges -- issue detainers when they believe there is probable cause to remove a non-citizen; detainers are requests to law enforcement, not mandatory orders, to permit ICE to assume custody. See 8 C.F.R. § 287.7; Gonzalez v. ICE , 975 F.3d 788, 799 (9th Cir. 2020); Hernandez v. United States, 939 F.3d 191, 200 (2d Cir. 2019); Galarza v. Szalczyk, 745 F.3d 634, 639-42 (3d Cir. 2014); Lunn v. Commonwealth, 78 N.E.3d 1143, 1148-53 (Mass. 2017). Regardless, Fajardo-Santos does not support the proposition that decisions by immigration officials can justify pretrial detention under the CJRA.

Fajardo-Santos considered New Jersey's prior system of pretrial release, which relied heavily on the use of monetary bail. 199 N.J. at 530. And the Court's conclusion rested in part on an interpretation of case law and a court rule in effect at the time of the 2009 appeal. See ibid. (citing State v. Johnson, 61 N.J. 351, 364 (1972); R. 3:26-1(a) (2009)). The ruling did not interpret a statute or its text, and the CJRA, of course, did not come into existence for another five years. Fajardo-Santos is not an interpretive aid for the CJRA or the issue now on appeal.

## VIII.

It is important to keep in mind that these appeals involved defendants who did not present a serious risk of flight, danger, or obstruction. Since 2017, defendants posing those types of risks have been detained under the CJRA.

The Attorney General could not estimate how many non-citizen defendants who are not detained are deported each year. The State conceded the concern involves "a relatively small total number of cases" in the overall context of pretrial release. Also, the parties have not provided data on how many defendants facing removal actually resolve their cases while the immigration process unfolds. Prosecutors can and do seek to defer action and

stay removal in appropriate cases so that the criminal process can be completed.

As noted earlier, it would be preferable for ICE to refrain from deporting defendants while they await trial for many reasons. If removal proceedings occur while a case is pending, we again urge ICE officials to work with prosecutors to allow pending criminal charges to be resolved.

IX.

For the reasons outlined above, we affirm the judgment of the Appellate Division in both matters.


JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in CHIEF JUSTICE RABNER's opinion. JUSTICE ALBIN, joined by JUSTICE PIERRE-LOUIS, filed a dissent in Lopez-Carrera and concurred in the judgment in Molchor and Rios.

State of New Jersey,

Plaintiff-Appellant,

v.

Oscar Lopez-Carrera,

Defendant-Respondent.
_____

State of New Jersey,

Plaintiff-Appellant,

v.

Juan C. Molchor,

Defendant-Respondent.
_____

State of New Jersey,

Plaintiff-Appellant,

v.

Jose A. Rios,

Defendant-Respondent.

JUSTICE ALBIN, dissenting in Lopez-Carrera; concurring in Molchor and
Rios

1

The State possesses the sovereign power to prosecute foreign nationals who are charged with committing crimes against New Jersey citizens. New Jersey crime victims, in turn, have the right to see that their perpetrators are brought to justice in this State. The exercise of the State's power to prosecute and the right of crime victims to see justice done, however, can be thwarted if the U.S. Immigration and Customs Enforcement (ICE) takes into custody undocumented aliens charged with crimes in New Jersey and removes them to their country of origin.[1] Today's decision bars a New Jersey court from issuing a detention order to prevent the certain and imminent removal of defendant aliens on pretrial release. That decision means that those defendants will not have to answer for their alleged crimes committed in this state.

In construing the Criminal Justice Reform Act (CJRA), N.J.S.A. 2A:162-15 to -26, the majority comes to a conclusion that is completely at odds with the fundamental tenets of state sovereignty and victims' rights guaranteed in the New Jersey Constitution and our laws. In passing the CJRA,

---

[1] The term "alien" is used here because it is part of the nomenclature of federal immigration law and regulation. See, e.g., 8 U.S.C. § 1101(a)(3) (defining "alien" as "any person not a citizen or national of the United States"); 8 U.S.C. § 1227 (defining who qualifies as a "deportable alien"); 8 C.F.R. § 287.7 (governing the Department of Homeland Security's issuance of detainers to "seek[] custody of an alien . . . for the purpose of arresting and removing the alien").

the Legislature did not express an intention to waive state sovereignty or to diminish the constitutional rights of New Jersey crime victims. The CJRA authorizes trial courts to deny pretrial release "to reasonably assure an eligible defendant's appearance in court when required." N.J.S.A. 2A:162-15. Yet, the majority has parsed that statutory language to reach a result that the Legislature could not have intended -- a result that leaves the State powerless to detain a defendant alien, subject to certain and immediate removal by ICE, to face prosecution and justice in a New Jersey court.

The stark and unsettling consequences of the majority's decision are evident in one of the cases before us. Defendant Oscar Lopez-Carrera was indicted on charges related to the sexual molestation of a minor.[2] While on pretrial release, defendant was taken into custody by ICE officials. Later, ICE informed prosecutors that a final order had been entered for the removal of Lopez-Carrera from this country to Guatemala. The State then immediately sought to revoke Lopez-Carrera's pretrial release so that he would not escape prosecution for his alleged crimes in New Jersey. Despite urgent appeals from

---

[2] Lopez-Carrera was indicted on charges of second-degree attempted sexual assault, N.J.S.A. 2C:5-1(a)(1) and 2C:14-2(c)(4), and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b). Defendants Juan Molchor and Jose Rios were charged with second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), and fourth-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1).

3

the State, certifying that Lopez-Carrera would be deported to Guatemala on the next available flight, no court -- including the New Jersey Supreme Court -- granted the State's emergent application for the issuance of a detention order.[3]

Because of the failure of our courts to intervene, ICE removed Lopez-Carrera from the United States to Guatemala, ensuring that he would not face justice for his alleged crimes. That discordant result is not commanded by the CJRA. I would hold that a court may grant the State's application for the pretrial detention of a defendant alien when a final order of removal has been issued, no appeals are pending, and removal by ICE is certain and imminent, as in the case of Lopez-Carrera. Because the State could not show that Molchor's and Rios's removals were certain and imminent, pretrial detention would have been inappropriate.

Today's decision will result in more defendant aliens not answering in a New Jersey courtroom for serious crimes committed against residents of this state. It is now for the Legislature to determine whether that decision is the result it intended in enacting the CJRA. Because the majority's interpretation of the CJRA preempts this state's sovereign authority to prosecute certain

---

[3] I voted in favor of granting the State's emergent application for a detention order to prevent Lopez-Carrera's removal to Guatemala.

4

defendant aliens for offenses committed in this state and denies crime victims their rights under our laws, I respectfully disagree with the majority's holding. More specifically, I dissent in Lopez-Carrera and concur in the judgment in Molchor and Rios.

I.

A.

A "State's power to prosecute is derived from its own inherent sovereignty." Heath v. Alabama, 474 U.S. 82, 89 (1985) (internal quotation marks omitted). Each state is armed with the police power to enforce the criminal laws within its jurisdiction and to vindicate the rights of crime victims. See United States v. Morrison, 529 U.S. 598, 618 (2000); see also Brecht v. Abrahamson, 507 U.S. 619, 635 (1993) ("The States possess primary authority for defining and enforcing the criminal law." (quoting Engle v. Isaac, 456 U.S. 107, 128 (1982))); State v. Denofa, 187 N.J. 24, 36 (2006) ("[T]he State is vested with the power to prosecute and punish crimes that occur . . . within its territorial borders.").

If, in enacting the CJRA, our Legislature intended to cede the State's sovereign power to prosecute aliens who are on pretrial release for crimes committed in New Jersey, one would expect it to have done so in clear and unmistakable language. Cf. Royster v. State Police, 227 N.J. 482, 494 (2017)

5

(noting that an effective waiver of sovereign immunity requires "a clear and unequivocal statement of the Legislature." (quoting Allen v. Fauver, 167 N.J. 69, 77 (2001))). Yet, neither the text nor the legislative history of the CJRA indicates that the Legislature waived the State's police power to detain a defendant alien who is subject to certain and immediate removal by ICE.

Indeed, a reading of the CJRA that deprives the State of its power to bring a defendant alien to justice would eviscerate the rights conferred on crime victims in the Victim's Rights Amendment to our State Constitution, N.J. Const. art. I, ¶ 22, and in the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38. The Victim's Rights Amendment promises crime victims that they will be treated with "fairness, compassion and respect" by the criminal justice system. State v. Lawless, 214 N.J. 594, 614 (2013) (quoting N.J. Const. art. I, ¶ 22). The Crime Victim's Bill of Rights guarantees victims the right to participate in the criminal justice process. See N.J.S.A. 52:4B-36; see also State v. Blackmon, 202 N.J. 283, 298-99 (2010). Those promises and rights are rendered meaningless if the CJRA preempts a court from entering a detention order that prevents the immediate removal of defendant aliens -- an order that would require that they face justice in this state. In passing the CJRA, the Legislature did not signal its intent to strip the State of its police powers or diminish the rights of crime victims. The CJRA must be

6

harmonized with the State's inherent sovereign powers and legislative enactments such as the Crime Victim's Bill of Rights. Ambiguities in the language of the CJRA should not be read to create conflict with other statutory schemes.

### B.

The CJRA empowers judges to detain defendants when the State has shown by clear and convincing evidence that no conditions of pretrial release (either non-monetary or monetary) "would reasonably assure the eligible defendant's <u>appearance</u> in court when required." N.J.S.A. 2A:162-18(a)(1) (emphasis added). Certainly, a "defendant's appearance in court when required" will not happen if ICE removes an indicted defendant alien from the country. As the majority correctly notes, the CJRA "does not expressly mention the risk of removal by immigration authorities." <u>Ante</u> at ___ (slip op. at 29).

Did the Legislature intend the use of the word "appearance" in its broadest sense to encompass circumstances that it may not have considered or anticipated, such as a removal of a defendant from the jurisdiction by ICE? Or did the Legislature intend to use the word "appearance" more narrowly, to refer only to voluntary non-appearances?

To resolve that perceived ambiguity, the majority essentially rewrites the statute by importing into the provision's text the word "voluntary." The recomposed statute, in effect, reads that a court can detain a defendant only when no conditions of release "would reasonably assure the eligible defendant's <u>voluntary</u> appearance in court when required." But if the drafters of the statute intended the word "voluntary" to be in the statute, presumably they would have put it there. See <u>DiProspero v. Penn</u>, 183 N.J. 477, 492 (2005) ("We cannot write in an additional qualification which the Legislature pointedly omitted. . . ." (quoting <u>Craster v. Bd. of Comm'rs of Newark,</u> 9 N.J. 225, 230 (1952))).

The majority justifies importing the volitional requirement by referring to various dictionary definitions of "appearance." Yet such definitions are hardly conclusive and clearly not determinative of legislative intent. See <u>State v. Sisler</u>, 177 N.J. 199, 207 (2003) (noting that a statute "must always be construed as a whole, and the particular meaning to be attached to any word or phrase is usually to be ascribed from the context, the nature of the subject matter treated of, and the purpose or intention of" the drafters (quoting 2A Norman J. Singer, <u>Sutherland Statutory Construction</u> § 46:05 at 167-68 (6th ed. 2000))); <u>see also</u> <u>Sherman v. Citibank (S.D.), N.A.</u>, 143 N.J. 35, 74 (1995) (Pollock, J., dissenting) ("More relevant than the meaning that lexicographers

assign to statutory terms is the meaning assigned by the Legislature."), vacated, 517 U.S. 1241 (1996). Merely because the term "appearance" typically involves a voluntary act does not suggest that it always does. The CJRA's legislative history suggests that the Legislature intended to allow for a defendant's detention even in the absence of a willful non-appearance from court.

An initial draft of the CJRA provided that a prosecutor could move for detention if there was a "serious risk that the defendant will flee," S. 946 § 5(a)(2)(a) (Jan. 27, 2014) (emphasis added). That language clearly envisions the potential for a voluntary act by a defendant, i.e., flight. The Legislature, however, amended that language to account for the "serious risk" that "the defendant will not appear in court as required," S. 946 § 6(a)(6)(a) (June 5, 2014) (emphasis added); N.J.S.A. 2A:162-19(a)(7)(a).

The change in language -- from narrow to broad -- may have been a simple acknowledgement by the Legislature that it could not foresee every scenario in which the statute might apply. See Perrelli v. Pastorelle, 206 N.J. 193, 208 (2011) ("It is frequently difficult for a draftsman of legislation to anticipate all situations and to measure his words against them." (quoting New Capitol Bar & Grill Corp. v. Div. of Emp. Sec., 25 N.J. 155, 160 (1957))). And for that reason, the Legislature may have added broader language to give

9

play in the joints of the statute to encompass circumstances such as a defendant's non-appearance because of the actions of immigration authorities. See Township of Pennsauken v. Schad, 160 N.J. 156, 170 (1999) ("[W]here a statute . . . does not expressly address a specific situation, the court will interpret it 'consonant with the probable intent of the draftsman.'" (quoting AMN, Inc. of N.J. v. S. Brunswick Twp. Rent Leveling Bd., 93 N.J. 518, 525 (1983))).

Further, in deciding whether pretrial detention or release is appropriate, trial courts, when reviewing a defendant's "history and characteristics," may consider non-volitional factors such as a defendant's "physical and mental condition," "family ties," and "financial resources." N.J.S.A 2A:162-20(c)(1). Those factors do not implicate "voluntary" conduct by persons subject to pretrial detention.

To the extent that the CJRA's language is susceptible to more than one reasonable interpretation, then we must consider the common-sense objectives of the Legislature and harmonize the CJRA with the State's inherent sovereign powers and enactments such as the Crime Victim's Bill of Rights. Dvorkin v. Township of Dover, 29 N.J. 303, 315 (1959) ("[W]hen the lawgiver's intent is in doubt, the court ought to interpret the law to be what is most consonant to equity . . . ." (quoting Kerlin's Lessee v. Bull, 1 U.S. 175, 178 (1786))).

10

Viewed in that light, we should not impute to the Legislature an intent to achieve a seemingly absurd result -- an intent to strip a court's power to enter a detention order to prevent a defendant alien's removal from the country and his escape from justice. See State v. Nance, 228 N.J. 378, 396 (2017) ("[S]tatutory interpretations that lead to absurd or unreasonable results are to be avoided." (alteration in original) (quoting State v. Haliski, 140 N.J. 1, 9 (1995))).

## II.

To be clear, I am not suggesting that a detention order can be entered solely because of an alien's status. Ordinarily, an alien's status should not be a factor. However, when a final order of removal has been entered, no appeals are pending, and ICE has reported that a defendant alien's removal from the country is certain and imminent, that is a different matter. Indeed, in the case of Lopez-Carrera, a flight was readied for his departure to Guatemala. In those circumstances, the State has met its burden that no condition of release "would reasonably assure the eligible defendant's appearance in court when required." N.J.S.A. 2A:162-18(a)(1); see also N.J.S.A. 2A:162-19(a)(7) (allowing the prosecutor to move for a defendant's pretrial detention where there is a "serious risk" of a defendant's nonappearance).

11

That common-sense interpretation is consistent with the objectives of the CJRA, the State's exercise of its inherent sovereign power, and the Victim's Rights Amendment and Crime Victim's Bill of Rights. That interpretation ensures that defendants like Lopez-Carrera will answer for their alleged crimes in a New Jersey courtroom and face their victims.

Under the CJRA, defendants charged with such crimes as aggravated sexual assault, armed robbery, kidnapping, and other serious offenses are subject to pretrial release. In all of those cases, victims have a right to see those defendants -- whether United States citizens or foreign nationals -- brought to justice. It is now for the Legislature to determine whether, in passing the CJRA, it intended to strip our courts of the power to enter detention orders that would prevent the removal of defendant aliens charged with committing crimes in this state.

For the reasons expressed, I respectfully disagree with the majority's holding, and I dissent in <u>Lopez-Carrera</u> and concur in the judgment in <u>Molchor</u> and <u>Rios</u>.